ACCEPTED
12-15-00083-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
12/22/2015 5:45:12 PM
Pam Estes
CLERK

## No. 12-15-00083-CV

**IN THE TWELFTH DISTRICT COURT OF APPEALS
TYLER, TEXAS**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
12/22/2015 5:45:12 PM
PAM ESTES
Clerk

**CARRIZO OIL & GAS, INC.,**
*Appellant,*

**v.**

**BARROW-SHAVER RESOURCES COMPANY,**
*Appellee.*

On Appeal from the 7th Judicial District Court
Smith County, Texas, Cause No. 12-2565-A

### BRIEF OF APPELLANT

| | | |
|---|---|---|
| Charles H. Clark | John M. Zukowski | Marcy Hogan Greer |
| State Bar No. 04274000 | State Bar No. 22293400 | State Bar No. 08417650 |
| chc@charlesclarklaw.com | jmz@zbsplaw.com | mgreer@adjtlaw.com |
| THE LAW OFFICES OF | Pascal Paul Piazza | Wallace B. Jefferson |
| CHARLES H. CLARK | State Bar No. 15966850 | State Bar No. 00000019 |
| 604 West Woldert Street | ppp@zbsplaw.com | wjefferson@adjtlaw.com |
| Tyler, Texas 75702 | ZUKOWSKI, BRESENHAN, | ALEXANDER DUBOSE |
| Telephone: (903) 593-2514 | SINEX & PETRY, L.L.P. | JEFFERSON & TOWNSEND LLP |
| Facsimile: (903) 595-1294 | 1177 West Loop South | 515 Congress Avenue |
| | Suite 1100 | Suite 2350 |
| | Houston, Texas 77027 | Austin, Texas 78701-3562 |
| | Telephone: (713) 965-9969 | Telephone: (512) 482-9300 |
| | Facsimile: (713) 963-9169 | Facsimile: (512) 482-9303 |

**ATTORNEYS FOR APPELLANT CARRIZO OIL & GAS, INC.**

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

**Appellant:** Carrizo Oil & Gas, Inc.

**Trial and Appellate Counsel:**

Marcy Hogan Greer *(trial & appellate counsel)*
State Bar No. 08417650
mgreer@adjtlaw.com
Wallace B. Jefferson *(appellate counsel)*
State Bar No. 00000019
wjefferson@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

John M. Zukowski
State Bar No. 22293400
jmz@zbsplaw.com
Pascal Paul Piazza
State Bar No. 15966850
ppp@zbsplaw.com
ZUKOWSKI, BRESENHAN, SINEX &
PETRY, L.L.P.
1177 West Loop South, Suite 1100
Houston, Texas 77027
Telephone: (713) 965-9969
Facsimile: (713) 963-9169

Charles H. Clark
State Bar No. 04274000
chc@charlesclarklaw.com
THE LAW OFFICES OF CHARLES H. CLARK
604 West Woldert Street
Tyler, Texas 75702
Telephone: (903) 593-2514
Facsimile: (903) 595-1294

**Appellee:**          Barrow-Shaver Resources Company

**Trial and Appellate**     Otis Carroll
**Counsel:**          State Bar No. 03895700
              ocarrroll@icklaw.com
              Deborah Race
              State Bar No. 16448700
              drace@icklaw.com
              Collin M. Maloney
              State Bar No.  00794219
              cmaloney@icklaw.com
              IRELAND, CARROLL & KELLEY, P.C.
              6101 S. Broadway, Suite 500
              Tyler, Texas 75703
              Telephone: (903) 561-1600
              Facsimile:  (903) 581-1071

              R. Clay Hoblit
              State Bar No. 09743100
              choblit@hfdlaw.com
              HOBLIT FERGUSON DARLING L.L.P.
              2000 Frost Bank Plaza
              802 North Carancahua
              Corpus Christi, Texas 78401
              Telephone: (361) 888-9392
              Facsimile:  (361) 888-9187

# TABLE OF CONTENTS

Identity of Parties and Counsel ...............................................................................i

Index of Authorities ........................................................................... vii

Record References .............................................................................xiv

Statement of the Case.........................................................................xv

Statement Regarding Oral Argument .................................................xvi

Issues Presented ............................................................................... xvii

Statement of Facts...............................................................................2

  A. The Parties Negotiate a Farmout Agreement for the Parkey Lease.........................................................................................3

  B. BSR Enters into a Purchase and Sale Agreement with Raptor............8

  C. Carrizo Refuses to Consent to the Assignment...................................9

  D. BSR Files Suit ....................................................................15

  E. The Jury Is Instructed and Reaches a Verdict....................................17

Summary of Argument .......................................................................19

Argument.............................................................................................22

I. The Trial Court Erred by Not Enforcing the Unambiguous Plain Language of the Farmout's Hard-Consent Provision....................................22

  A. Standard of Review .............................................................22

  B. The Plain Language of the Farmout Expresses an Agreement to an Unqualified "Hard Consent" ........................................................22

II. The Farmout Agreement Leaves No Room for Implying a Covenant— Especially One that the Parties Expressly Rejected ....................................25

iii

A.     Standard of Review ..............................................................25

B.     The Trial Court Erred in Allowing the Jury to Imply a Covenant That Does Not Exist in the Contract ................................................25

III.    The Exclusion of Uncontroverted Evidence That the Parties Agreed to a Hard Consent Compounded the Error in Misconstruing the Agreement ...........................................................................................28

A.     Standard of Review ..............................................................28

B.     Evidence of Carrizo and BSR's Prior Negotiations Is Admissible ............................................................................29

C.     The Trial Court's Erroneous Resort to Custom and Usage Evidence Required Admission of the Prior-Negotiation Evidence ...............................................................................31

IV.    The Trial Court Erred in Admitting BSR's Evidence Regarding Custom and Usage ...........................................................................34

A.     Standard of Review ..............................................................34

B.     Kramer's Testimony Failed to Satisfy the Proof Requirements for Custom and Usage and Therefore Constitutes No Evidence .......35

C.     The Trial Court Erred in Admitting Kramer's Opinions Regarding Custom and Usage ...........................................................36

       1.     Kramer was not qualified to testify regarding custom and usage with respect to the Farmout Agreement ........................36

       2.     Kramer's testimony regarding custom and usage was not relevant ................................................................................37

       3.     Kramer's testimony regarding custom and usage was not reliable ..................................................................................38

V.    The Contract Damages Awarded by the Jury Lack Legally and Factually Sufficient Proof in the Trial Record .............................................39

A.     Standard of Review ..............................................................39

B.   The $27.6 Million Contract Damages Award Necessarily and Improperly Includes Compensation for the Exploration Partners .....41

C.   BSR Should Not Have Recovered any Damages on Behalf of the Exploration Partners ...................................................................43

1.   BSR failed to prove that the Exploration Partners assigned any viable causes of action against Carrizo to BSR ..........................................................................................44

a.   BSR did not prove that any purported causes of action were assigned to it.................................................44

b.   BSR did not prove that the Exploration Partners had any causes of action that were capable of assignment ...............................................................45

2.   BSR was not entitled to seek recovery of the Exploration Partners' alleged damages.......................................48

D.   BSR Lacks Competent, Admissible Proof to Support a Damages Award ......................................................................49

VI.   The Farmout Agreement Conclusively Negates BSR's Tort Claims...........51

A.   BSR's Fraud Claim Is Premised Entirely on its Erroneous Construction of the Farmout Agreement.............................................51

B.   Carrizo's Justification Defense Was Established as a Matter of Law ......................................................................................52

VII.   Evidentiary Errors Require a New Trial........................................................53

A.   Standard of Review .................................................................53

B.   The Exclusion of Key Evidence Prejudiced Carrizo ........................54

VIII.   Charge Errors Warrant a New Trial .............................................................56

A.   Standard of Review .................................................................56

B.   The Contract Instructions Were Patently Erroneous.........................56

IX.    The Attorneys' Fees Award Should Be Reversed.........................................58

Conclusion and Prayer .......................................................................................60

Certificate of Service .........................................................................................63

Certificate of Compliance ..................................................................................63

Appendix

**Cases**

*Americo Life, Inc. v. Myer*,
440 S.W.3d 18 (Tex. 2014)......................................................................22, 30

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*,
297 S.W.3d 768 (Tex. 2009) ............................................................42, 49, 50

*BP Am. Prod. Co. v. Zaffirini*,
419 S.W.3d 485 (Tex. App.—San Antonio 2013, pet. denied)..........................31

*Ceramic Tile Int'l, Inc. v. Balusek*,
137 S.W.3d 722 (Tex. App.—San Antonio 2004, no pet.) ...............................44

*Cessna Aircraft Co. v. Aircraft Network, LLC*,
345 S.W.3d 139 (Tex. App.—Dallas 2011, no pet.) .........................................60

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ..........................................................................40

*City of Laredo v. Montano*,
414 S.W.3d 731 (Tex. 2013) .....................................................................58, 60

*Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd.*,
123 S.W.3d 735 (Tex. App.—Houston [14th Dist.] 2003, pet.
denied).............................................................................................................27

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
284 S.W.3d 851 (Tex. 2009) ..........................................................................56

*In re Commitment of Polk*,
187 S.W.3d 550 (Tex. App.—Beaumont 2006, no pet.) ..................................60

*Corso v. Carr*,
634 S.W.2d 804 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) ...................32

*Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*,
823 S.W.2d 591 (Tex. 1992) ..........................................................................23

*Danciger Oil & Ref. Co. of Tex. v. Powell*,
137 Tex. 484, 154 S.W.2d 632 (1941) ...........................................................26

*DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*,
  112 S.W.3d 854 (Tex. App.—Houston [14th Dist.] 2003, pet.
  denied)................................................................................................52

*Dyer v. Cotton*,
  333 S.W.3d 703 (Tex. App.—Houston [1st Dist.] 2010, no pet.)......................29

*Dynegy Midstream Servs., L.P. v. Apache Corp.*,
  294 S.W.3d 164 (Tex. 2009) ...........................................................................22

*E.I. du Pont de Nemours & Co. v. Robinson*,
  923 S.W.2d 549 (Tex. 1995) ............................................................................34

*In re E.I. DuPont de Nemours & Co.*,
  136 S.W.3d 218 (Tex. 2004) .....................................................................59, 60

*El Apple I, Ltd. v. Olivas*,
  370 S.W.3d 757 (Tex. 2012) ............................................................................58

*Energen Res. MAQ, Inc. v. Dalbosco*,
  23 S.W.3d 551 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ................33

*Esco Elevators, Inc. v. Brown Rental Equip. Co.*,
  670 S.W.2d 761 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) ....................45

*Exxon Pipeline Co. v. Zwahr*,
  88 S.W.3d 623 (Tex. 2002).......................................................................37, 38

*Fisher Controls Int'l, Inc. v. Gibbons*,
  911 S.W.2d 135 (Tex. App.—Houston [1st Dist.] 1995, writ
  denied)................................................................................................52

*Flagstar Bank, FSB v. Walker*,
  451 S.W.3d 490 (Tex. App.—Dallas 2014, no pet.) .........................................45

*Gammill v. Jack Williams Chevrolet, Inc.*,
  972 S.W.2d 713 (Tex. 1998) ............................................................................36

*Gharda USA, Inc. v. Control Solutions, Inc.*,
  464 S.W.3d 338 (Tex. 2015) ......................................................................34, 38

*Gips v. Red Robin Corp.*,
  366 S.W.2d 853 (Tex. Civ. App.—Houston 1963, writ ref'd n.r.e.)..................55

*Gulf Ins. Co. v. Burns Motors, Inc.*,
    22 S.W.3d 417 (Tex. 2000)....................................................................45

*Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*,
    356 S.W.3d 54 (Tex. App.—Houston [1st Dist.] 2011, no pet.)........................53

*HECI Expl. Co. v. Neel*,
    982 S.W.2d 881 (Tex. 1998) ...................................................25, 26, 28

*Holt Atherton Indus., Inc. v. Heine*,
    835 S.W.2d 80 (Tex. 1992)....................................................................49, 51

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
    352 S.W.3d 462 (Tex. 2011) ...............................................................30, 31

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
    341 S.W.3d 323 (Tex. 2011) ...............................................................22

*JLG Trucking, LLC v. Garza*,
    58 Tex. Sup. Ct. J. 726, 2015 WL 1870072 (Tex. Apr. 24, 2015)....................53

*Johnson v. Driver*,
    198 S.W.3d 359 (Tex. App.—Tyler 2006, no pet.)....................................23, 24

*Kachina Pipeline Co. v. Lillis*,
    No. 13-0596, 2015 WL 5889109 (Tex. Oct. 9, 2015) ...........................24, 32, 33

*Lamont v. Vaquillas Energy Lopeno Ltd., LLP*,
    421 S.W.3d 198 (Tex. App.—San Antonio 2013, pet. filed)...........................52

*Larson v. Cactus Util. Co.*,
    730 S.W.2d 640 (Tex. 1987) ...............................................................40

*Lively v. Blackwell*,
    51 S.W.3d 637 (Tex. App.—Tyler 2001, pet. denied) ...............................28, 53

*Lubbock Cty. Water Control and Imp. Dist. v. Church & Akin, L.L.C.*
    442 S.W.3d 297 (Tex. 2014) ...............................................................27

*MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*,
    995 S.W.2d 647 (Tex. 1999) ...............................................................46

*McMillen v. Klingensmith*,
467 S.W.2d 193 (Tex. 1971) ........................................................48

*Mengden v. Peninsula Production Co.*,
544 S.W.2d 643 (Tex. 1976) ..........................................................3

*Merrell Dow Pharms., Inc. v. Havner*,
953 S.W.2d 706 (Tex. 1997) ........................................................39

*Nat'l Prop. Holdings, L.P. v. Westergren*,
453 S.W.3d 419 (Tex. 2015) ........................................................51

*OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*,
234 S.W.3d 726 (Tex. App.—Dallas 2007, pet. denied)..................46

*Oil Ins. Ass'n v. Royal Indem. Co.*,
519 S.W.2d 148 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd
n.r.e.) ..........................................................................................31

*Owen v. Talbot*,
441 S.W.2d 887 (Tex. Civ. App.—Texarkana 1969, writ ref'd
n.r.e.) ..........................................................................................39

*Palmer v. Liles*,
677 S.W.2d 661 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd
n.r.e.) ..........................................................................................55

*Paragon Sales Co. v. N.H. Ins. Co.*,
774 S.W.2d 659 (Tex. 1989) ........................................................47

*Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*,
391 S.W.3d 596 (Tex. App—Houston [14th Dist.] 2012, pet.
denied)..........................................................................................50

*Phillips v. Carlton Energy Grp., LLC*,
58 Tex. Sup. Ct. J. 803, 2015 WL 2148951 (May 8, 2015) ..............49

*PNP Petroleum I, LP v. Taylor*,
438 S.W.3d 723 (Tex. App.—San Antonio 2014, pet. denied)....................30, 31

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*,
29 S.W.3d 74 (Tex. 2000)..............................................................53

x

*R&R White Family Ltd. P'ship v. Jones*,
    182 S.W.3d 454 (Tex. App.—Texarkana 2006, no pet.)....................................45

*Redmon v. Griffith*,
    202 S.W.3d 225 (Tex. App.—Tyler 2006, pet. denied) ...................................46

*Reeder v. Wood Cty. Energy,* LLC,
    395 S.W.3d 789 (Tex. 2012) ............................................................................23

*Reynolds v. McCullough*,
    739 S.W.2d 424 (Tex. App.—San Antonio 1987, writ denied) ...................23, 26

*Ritchie v. Rupe*,
    No. 11-0047, 2014 WL 2788335 (Tex. June 20, 2014) ..................................46

*Se. Pipe Line Co. v. Tichacek*,
    997 S.W.2d 166 (Tex. 1999) ............................................................................40

*Spencer v. Eagle Star Ins. Co. of Am.*,
    876 S.W.2d 154 (Tex. 1994) ............................................................................40

*State Nat'l Bank of Hous. v. Woodfin*,
    146 S.W.2d 284 (Tex. Civ. App.—Galveston 1940, writ ref'd) ..................35, 38

*Stephenville, N. & S.T. Ry. Co. v. Baker*,
    203 S.W. 385 (Tex. Civ. App.—Austin 1918, no writ)....................................48

*Sun Oil Co. (Del.) v. Madeley*,
    626 S.W.2d 726 (Tex. 1981) ............................................................................30

*Tex. Beef Cattle Co. v. Green*,
    921 S.W.2d 203 (Tex. 1995) ............................................................................53

*Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*,
    306 S.W.3d 860 (Tex. App.—Tyler 2010, pet. denied) ...................................22

*Thompson v. CPN Partners, L.P.*,
    23 S.W.3d 64 (Tex. App.—Austin 2000, no pet.).............................................27

*Thota v. Young*,
    366 S.W.3d 678 (Tex. 2012) ............................................................................56

*Tony Gullo Motors I, L.P. v. Chapa*,
   212 S.W.3d 299 (Tex. 2006) ....................................................................59

*Trinity Prof'l Plaza Assocs. v. Metrocrest Hosp. Auth.*,
   987 S.W.2d 621 (Tex. App.—Eastland 1999, pet. denied) ...............................26

*Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*,
   121 S.W.3d 742 (Tex. 2003) ............................................................25, 26

*In re V.L.K.*,
   24 S.W.3d 338 (Tex. 2000)....................................................................56

*Valence Operating Co. v. Anadarko Petroleum Corp.*,
   303 S.W.3d 435 (Tex. App.—2010, no pet.)...................................................37

*Vernco Constr., Inc. v. Nelson*,
   460 S.W.3d 145 (Tex. 2015) .................................................................44

*Weil v. Anne Lewis Shops, Inc.*,
   281 S.W.2d 651 (Tex. Civ. App.—San Antonio 1955, writ ref'd) ........25, 27, 28

*Whirlpool Corp. v. Camacho*,
   298 S.W.3d 631 (Tex. 2009) .................................................................38

*Wiese v. Pro Am Servs., Inc.*,
   317 S.W.3d 857 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ...................50

*Wolert v. Arledge*,
   4 Tex. Civ. App. 692, 23 S.W. 1052 (1893)....................................................39

*XTO Energy Inc. v. Smith Prod., Inc.*,
   282 S.W.3d 672 (Tex. App.—Houston [14th Dist.] 2009, pet.
   dism'd) ..............................................................................................35

*Zaan LLC v. Sangani*,
   No. 05-12-00423-CV, 2015 WL 2398652 (Tex. App.—Dallas May
   20, 2015, pet. filed)........................................................................45

**Statutes and Rules**

TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8)...................................................58

TEX. R. APP. P. 44.1 ...................................................................................35

TEX. R. APP. P. 44.1(a)(1) ......................................................................53

TEX. R. CIV. P. 320 ...............................................................................40

TEX. R. EVID. 611(b) .............................................................................59

TEX. R. EVID. 702...............................................................................34, 36

TEX. R. EVID. 705(a) .............................................................................59

**Other Authorities**

Allen D. Cummings, *Consent Asked For – But Not Received:  The
   Enforceability of Consent to Assignment or Transfer Provisions*,
   38th Annual Ernest E. Smith, OIL, GAS & MINERAL LAW INST.
   (Mar. 30, 2012) ................................................................................24

Louis J. Davis, *Preferential Rights to Purchase and Consents to
   Assign*, ASSOC. OF CORPORATE COUNSEL, HOUS. CHAPTER (Oct. 2,
   2013) ...........................................................................................5, 23

WILLIAMS AND MEYERS, OIL AND GAS LAW, MANUAL OF TERMS
   (1971) ..............................................................................................3

## RECORD REFERENCES

The record on appeal is composed of 15 volumes of a clerk's record, containing copies of the pleadings, motions, orders, and other papers from the district court's files, which will be referred to by volume, "CR," and the corresponding page number—*e.g.*, 1CR221. The First Supplemental Clerk's Record will be cited as "1stSuppCR," with the corresponding page number.

The court reporter's record is composed of 10 volumes of transcription of the trial proceedings and exhibits that will be cited by "RR" volume and page number—*e.g.*, 1RR32.

Exhibits contained in volumes 11-36 of the reporter's record will be referred to by the offering party ("DX" or "PX"), exhibit number and internal page reference where appropriate. The supplemental exhibit to the court reporter's record will be cited as 1stSuppRR-JX1, with appropriate internal exhibit and page references.

Documents contained in the Appendix will additionally be cited as "App." with the corresponding tab letter.

STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case:* | Breach of contract and tort case involving a Farmout Agreement between Defendant-Appellant Carrizo Oil & Gas, Inc. ("Carrizo") and Plaintiff-Appellee Barrow-Shaver Resources Company ("BSR").[1] PX36 (App. 3). A jury found that Carrizo was required to consent to BSR's assignment of BSR's rights and obligations under the Farmout Agreement or to provide a reasonable basis for refusing to do so. 13CR3180. |
| *Trial Court:* | Hon. Kerry L. Russell, 7th Judicial District Court, Smith County, Texas |
| *Course of Proceedings:* | The district court refused to respect the parties' agreement that Carrizo could refuse to consent to an assignment by BSR of its obligations under the Farmout Agreement without having to provide any justification for its decision. 13CR3063;13CR3081; 13CR3085-87;10RR111-12;10RR114-15. The matter was tried to a jury, which found Carrizo liable for breach of contract, fraud, and tortious interference and awarded damages. 13CR3177-87 (App. 2). |
| *Trial Court Disposition:* | Judgment entered on jury's verdict awarding Plaintiff-Appellee $27.6 million in contract damages and $1.018 million in attorneys' fees. 15CR3528-30 (App. 1). |

---

[1] BSR is now known as Barrow-Shaver Resources Company LLC.

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves a complicated conflation of contract interpretation principles that led to a $31.6 million judgment against Carrizo based on an alleged promise that is not contained in the parties' agreement. The record from the two-week jury trial is voluminous, and Defendant-Appellee respectfully submits that oral argument would aid the Court's decision making.

## ISSUES PRESENTED

1. The parties' agreement unqualifiedly required a written consent from Carrizo in order for BSR to assign its rights and obligations. Did the district court err in failing to construe the agreement as a matter of law as providing Carrizo the unqualified right to refuse its consent?

2. Was it error for the district court to have allowed the jury to nonetheless impose a duty on Carrizo not to unreasonably withhold its consent?

3. Did the trial court err in excluding evidence of the parties' negotiations during which they specifically agreed to delete the language "which consent shall not unreasonably be withheld" from the consent provision of their agreement prior to execution?

4. Was custom and usage evidence improperly admitted to impose additional duties on Carrizo not found in the Farmout Agreement?

5. Assuming custom and usage evidence could properly be considered, was the opinion testimony of BSR's expert witness sufficiently reliable and relevant to be admitted?

6. BSR was allowed to recover $27.6 million in damages representing the value of a third-party contract it claims it lost as a result of Carrizo's breach, notwithstanding the fact BSR would have received only a small fraction of that sum had the other contract closed.

   a. Was it proper for the jury to award BSR the face value of a separate contract it claimed to have lost as a result of Carrizo's refusal to consent when that separate agreement unequivocally obligated BSR to share the compensation with non-parties?

   b. Did BSR lack standing to sue to recover on behalf of the non-parties where it put on no proof of any assignment and demonstrated no representational capacity under any agreement or other authority to sue on their behalf?

   c. Were the contract damages awarded to BSR excessive, considering that the record conclusively showed that BSR was obligated to share unspecified portions of that recovery with non-parties?

d. Was it appropriate for BSR to recover damages on behalf of non-parties when those non-parties had neither pleadings nor proof of any wrong by Carrizo against them?

7. Was BSR entitled to recover damages based on an improper measure?

8. BSR claimed that it relied on oral promises from Carrizo's landman that, notwithstanding the unqualified consent provision in the Farmout Agreement, Carrizo would consent to any future assignment proposed by BSR. Can such a statement or promise constitute fraud when it is contradicted by the express terms of the Farmout Agreement?

9. Was Carrizo's justification defense to the tortious interference claim established as a matter of law?

10. Did the district court err in excluding the only document evidencing the $1.358 million profit that BSR would have actually recovered under the third-party agreement that was allegedly terminated as a result of Carrizo's refusal to grant a consent?

11. Should BSR's letter providing its opinion to a third party that Carrizo's refusal to consent could not prevent BSR from validly assigning its rights and offering to indemnify the third party from damages have been excluded from the jury's consideration?

12. Are the trial court's erroneous charge instructions grounds for reversal of the judgment?

13. Did the district court err in granting an award of attorney's fees to BSR based on evidence that was not disclosed to Carrizo?

TO THE HONORABLE TWELFTH COURT OF APPEALS:

Carrizo must pay over $30 million in damages for a purported breach of an obligation that is not found in the parties' written agreement. During their negotiations, the parties expressly removed from the contract the language BSR wishes was there. Instead, they agreed to a "hard consent:" BSR could not assign BSR's obligations under the agreement without Carrizo's consent, and Carrizo could withhold that consent without consequence. The parties' intent could not be clearer: both sides testified that they agreed to delete a clause from a prior draft of their agreement providing that Carrizo's "consent shall not be unreasonably withheld." And, as a result, neither the contract nor the negotiations giving rise to it required Carrizo to consent to any assignment. The case should have terminated on summary judgment.

Instead, however, the trial court asked the jury to determine whether Carrizo's consent was subject to a "not to be reasonably withheld" qualifier based on "industry custom and expectations."[2] In effect, the trial court concluded that an obligation that the parties removed from the Farmout Agreement could be imposed on Carrizo by implication. Compounding this error, the court instructed the jury that "the Farmout Agreement is silent about the reasons under which Carrizo could refuse consent to

---

[2] 13CR3180.

BSR's assignment,"[3] excluded all evidence of the parties' actual negotiations and intent on the consent clause,[4] and instructed the jury it could imply a "not [to] be unreasonably withheld" covenant based on "industry custom."[5] Whether a covenant can be implied is a question of law, not fact. And, in any event, implied covenants are disfavored because the parties are expected to spell out their rights and obligations within the four corners of their written agreement.[6] The exacting standards for an implied covenant have not been met in this case. The jury should never have been permitted, much less instructed, to determine the parameters of Carrizo's consent or to find a breach and multi-million-dollar damages. The Court should render judgment for Carrizo.

## STATEMENT OF FACTS

This appeal arises out of a Farmout Agreement between Carrizo and BSR. PX31. In the oil and gas industry, a farmout agreement is not an interest in land but a grant of exploration rights with a contingent right to receive an interest in land if the assignee performs. 5RR23,142-43. "The primary characteristic of a farmout is the obligation of the assignee to drill one or more wells on the assigned acreage as a

---

[3] *Id.*

[4] 13CR3063-65;13CR3067-78;13CR3080-82;13CR3084-89.

[5] 13CR3180.

[6] *See* Argument part I.

2

prerequisite to the completion of the transfer to him." *Mengden v. Peninsula Production Co.*, 544 S.W.2d 643, 645 n.1 (Tex. 1976) (quoting WILLIAMS AND MEYERS, OIL AND GAS LAW, MANUAL OF TERMS 167 (1971)).

Carrizo is an independent oil and gas exploration and production company. 7RR41-43. BSR, also an oil and gas company, engaged in prospect development, producing property acquisition, lease acquisition, and the assembly and marketing of prospects for the exploration and development of oil and natural gas. 7RR143-44. By its own testimony, BSR is a sophisticated player in the industry. 7RR235-36.

### A. The Parties Negotiate a Farmout Agreement for the Parkey Lease

In July 2008, Carrizo acquired an undivided 100% working interest in the "Parkey Lease," which was part of PanAmerican Operating, Inc.'s Kingdom Prospect in the Caddo Arch Bend in North Texas. DX12 & 15;5RR125;7RR48-49.

In mid-2010, BSR identified the Caddo Arch Bend as an area of interest and began acquiring assets in the area ("Prospect"). DX9. BSR had initially expressed interest in the Parkey Lease during 2010, but nothing came of that effort, as Carrizo was still actually exploring on the Parkey Lease. 7RR145-47. A few weeks before the Parkey Lease was to expire, however, Carrizo offered, and BSR accepted, a farmout opportunity to acquire Carrizo's exploration rights in the Parkey Lease. DX9.

3

The Farmout Agreement gave BSR the right to earn assignments of Carrizo's interest in the undeveloped acreage of the Parkey Lease below 2,500 feet as long as BSR drilled wells, established production in paying quantities, and otherwise fulfilled its obligations under the agreement. PX36. Specifically, if BSR drilled an earning well, Carrizo would assign BSR 100% of the working interest below 2,500 feet and within 320 acres around each earning well drilled on the 20,000+ acre Parkey Lease. *Id*. Carrizo would reserve an overriding royalty interest only in the 320 acres assigned to BSR. *Id.* BSR did not otherwise pay Carrizo for the exploration rights to the 20,000 acres conveyed in the Farmout. *Id.*

During the negotiations leading up to the Farmout Agreement, multiple drafts were exchanged by the parties' representatives—principally Stewart Laufer ("Laufer") for Carrizo and Hal Bertram ("Bertram") for BSR, both of whom are sophisticated in the industry. DX17;DX18;DX20,DX22;5RR160-63,167,243; 8RR138-42. Laufer, a landman, was the only Carrizo employee involved in the direct negotiations with BSR, although, as BSR understood, he did not have authority to bind Carrizo. 5RR250-52,254;8RR139,146-47.

BSR prepared the first draft. 5RR244. It contained no clause relating to BSR's ability to assign its rights and obligations under the Farmout to a third party. DX17. Carrizo had confidence in BSR that it would perform and hold the Parkey Lease, so it did not want BSR to assign those obligations to an unknown third party.

4

8RR147.  Consequently, Carrizo proposed a clause obligating BSR to obtain Carrizo's written consent before any such assignment.  DX18 at CAR000000977.  Carrizo included this provision "to control who could take over" BSR's Farmout obligations.  8RR147.  Such clauses are "standard" in farmout agreements, as Carrizo's expert explained, "[b]ecause you want to know that whoever's operating your lease, building a well on it, has the financial resources to follow through and meet his obligation.  You want to know that he has the technical ability, the experience, and the knowledge to do it properly."  9RR19.

The first iteration of the consent-to-assign clause contained the following emphasized language:

> The rights provided to BSR under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo, *which consent shall not be unreasonably withheld*.

*E.g.*, DX18 (emphasis added).  In a later draft sent to BSR on March 29, 2011, Carrizo struck the emphasized language.  DX20 at BSR00056.  An unqualified consent provision is not unusual in the oil and gas industry.  Louis J. Davis, *Preferential Rights to Purchase and Consents to Assign*, ASSOC. OF CORPORATE COUNSEL, HOUS. CHAPTER (Oct. 2, 2013) at 22 (App. 6).  It can be found in all types of agreements, including farmouts, joint operating agreements, leases, and purchase and sale agreements.  Contracting parties request it when they want total control over assignments to third parties—especially when those parties are unknown or

5

unproven—and "[y]ou don't want to have to justify saying 'no.'" 9RR20. An unqualified, or "hard," consent provision means exactly that. 9RR20-21;10RR111-12. It avoids forcing the nonconsenting party to defend its decision, denigrate the proposed assignee, or disclose a confidential business reason. 9RR21-23,36.

BSR fumed about the stricken clause. Bertram went immediately to BSR's Managing Partner, Scott Shaver ("Shaver")—who became involved for the first time in the negotiations—informing Shaver that Carrizo had deleted the clause in the consent-to-assign provision. 5RR248-52 (App. 4); 5RR251-52 (App. 5).[7] Together, Shaver and Bertram challenged Laufer about the stricken text. 5RR251-52;10RR119. Bertram characterized the change as "an 180-degree reversal." 5RR249. Both Shaver and Bertram understood the full implication of the modified consent-to-assign provision, which permitted Carrizo to unilaterally withhold its consent. 5RR249-50;10RR119-20. Yet, each claimed that Laufer orally assured them that consent would be forthcoming notwithstanding the strikeout. 5RR176,180-81;7RR156;10RR119-20.

Laufer, on behalf of Carrizo, confirmed to BSR that Carrizo would not restore the "not be unreasonably withheld" language and would only sign an agreement

---

[7] Testimony as to the exchange of drafts was provided in a bill of exceptions, as the trial court would not allow counsel to question witnesses about the prior drafts before the jury. *See* 5RR244-53.

6

without that restriction. 5RR250-52. In testimony outside the presence of the jury, Shaver and Bertram conceded that they understood the implications of the revised provision. 5RR252-53;10RR119-20. Yet BSR executed it anyway:

> The rights provided to BSR under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo.

PX36 at 2.

During the parties' later dispute, Carrizo learned for the first time that BSR had sold 100% of the working interest in the Prospect (but did not assign the Farmout) to third-party investors ("Exploration Partners") in order to fund the Prospect's exploration.[8] 5RR106-07;DX16. Carrizo sought third-party discovery as to these Exploration Partners, but the district court would not allow it. 1stSuppCR1-3.

BSR did not enter in the Farmout Agreement on behalf of the Exploration Partners. 7RR236-37. The Exploration Partners are not parties to the Farmout Agreement. *Id.* They never acquired any rights in the Farmout Agreement because

---

[8] Although they were referred to as "Exploration Partners" at trial, the trial court excluded evidence that these investors were not legal partners of BSR. To the contrary, the contracts creating their relationship expressly disclaimed any "intention of the parties hereto to create, nor shall this agreement be construed as creating a mining or other partnership or association to render them liable as partners. The relationship of the parties hereto shall be that of independent contractors owning properties as co-tenants." DX16 at BSR002384.

7

BSR never requested Carrizo's consent to assign any portion of its farmout rights to the Exploration Partners. 7RR237.

## B. BSR Enters into a Purchase and Sale Agreement with Raptor

After drilling three wells with disappointing results, BSR felt that it had "done the best that we could with the technology that we had." 8RR104. BSR was concerned about the project because of the poor production after claiming to invest over $20 million of the Exploration Partners' money. 5RR106-07;7RR218;8RR104.[9]

Raptor Petroleum II, LLC ("Raptor") approached BSR "out of the blue" about the property, and "it was a Godsend because we hadn't had, really, the luck we needed to move the project forward." 7RR218;8RR20. According to Shaver, Raptor "had a better idea" than BSR and "could look past the poor production that we had established, thinking that they could do better." *Id.*

BSR and the Exploration Partners,[10] as "Seller," and Raptor, as Buyer, entered into a Purchase and Sale Agreement ("PSA") to sell BSR and the other Exploration Partners' interests in the Parkey Lease and other properties in the Prospect, totaling more than 61,500 net acres. PX133 (DX34) at BSR000982. Although they are

---

[9] The district court excluded evidence showing that $20 million number was incorrect and deprived the jury the chance to weigh the credibility of BSR's contrary representation. 5RR107-08.

[10] These two dozen other Sellers, who were not corporately related to BSR, are listed in Schedule 1 to, and on the signature pages of, the PSA. DX34 at BSR000982,BSR001024-48;5RR223-26.

referred to as "Exploration Partners," these other Sellers were "independent contractors owning the properties as co-tenants." DX16 at BSR002384.

The purchase price of the PSA was $27.6 million, but under the PSA, BSR was to distribute the proceeds to the Exploration Partners and only retain a fraction of the purchase price in its own right. 5RR237; *see also* 1stSuppRR-JX1(Exhibit B) at 22 (Raptor's president testifying that the payment would be made to BSR "and for further distribution to the other sellers."). The Preliminary Closing Statement for the Raptor PSA showed that BSR was going to receive a total profit of $1.358 million at closing. 10RR120-25;DX32.[11] The remainder of the consideration was to be paid to the Exploration Partners. *Id.*; *see also* DX34.

### C. Carrizo Refuses to Consent to the Assignment

In May, 2012, BSR sought Carrizo's consent to assign BSR's rights under the Farmout to Raptor. 8RR148. Laufer forwarded BSR's request to Carrizo's management because he did not have, and never had, the authority to act. 8RR147-49. At management's request, Laufer investigated but found nothing enlightening about Raptor's involvement in leases or drilling activities in Texas. 8RR149-50. On June 12, 2012, Carrizo's Chief Operating Officer Brad Fisher ("Fisher"), Laufer, and others met to discuss the request. 8RR151,154;10RR22-23. At the end of the

---

[11] This document and the testimony about it were excluded from evidence by the district court, although admitted for purposes of the bill of exceptions. 13CR3064;10RR125.

meeting, Fisher indicated his reluctance to give consent, but wanted to discuss it with Chief Executive Officer Sylvester "Chip" Johnson ("Johnson") before finalizing any decision. 8RR155;10RR23. So, Fisher instructed Laufer not to call BSR until a final determination was made. 8RR155.

Soon after the June 12 meeting, Laufer left the country for a long-planned 25th-wedding anniversary trip. 7RR176;8RR156-57. In his absence, another Carrizo landman, Sarah Ruddock ("Ruddock"), filled in for Laufer. *Id*. Ruddock, however, had no prior involvement with or knowledge about the Parkey Lease or the Farmout. 8RR228,230-32. Shaver led Ruddock to believe that Carrizo did not object to the consent. 8RR227-29,231-32. Later, she learned that the Farmout and consent issues were more involved than she had originally appreciated and that discussions were already underway within Carrizo, with Carrizo being disinclined to grant approval. 8RR234-35. She informed BSR that Laufer would again be the point of contact for the Farmout Agreement when he returned. 8RR245;DX47.

BSR nevertheless kept pressing Ruddock for an answer, falsely reporting that the Raptor deal was closing a week earlier than actually scheduled to close,[12] and she communicated the message to Fisher. DX49;8RR248-49. On June 22, 2012,

---

[12] BSR and Raptor had already extended the closing date to July 3 by the point of this communication, but Shaver indicated that it was still scheduled for June 25. DX48-49;7RR254;8RR49-50,248-49.

Fisher made the decision—after consulting with Carrizo's CEO, Johnson—that Carrizo would not grant its consent. 7RR112,115,138;DX49,50. Because he understood that the Farmout provided Carrizo a "hard consent," meaning that Carrizo could grant or deny its consent without having to justify the decision to BSR, he did not consider giving BSR a rationale. 10RR111-12. Carrizo did not offer any monetary terms to obtain consent; it simply exercised its option under the Farmout Agreement and refused consent. PX210;DX50;8RR250;7RR113. Fisher considered his June 22 decision to be final and instructed Ruddock to communicate the message to BSR, which she did in a telephone call and a single-line email: "Carrizo does not consent to the assignment." 7RR115-16;8RR251-52;DX50.

Shaver *never* communicated to Carrizo his contention that Laufer had made promises about future consents to anyone at Carrizo—even after Carrizo had communicated its refusal to consent to the Raptor assignment. 7RR224 (Q: "[Y]ou never told anyone at Carrizo that Stewart Laufer made that promise, correct? A: I did not."). In fact, Shaver did not communicate with anyone at Carrizo except for Laufer and later Ruddock, both of whom were landmen without authority to give consent. *Id.* Instead, he relied on one of BSR's Exploration Partners, Tana Oil & Gas ("Tana"), to reach out to another Carrizo executive, Richard Smith ("Smith"), Vice-President of Land, in an attempt to get Carrizo to reconsider the decision. 7RR244-45;8RR160-61;10RR72-73. Smith conveyed Carrizo's concern about

11

Raptor's ability to perform to Tana. 8RR71. BSR later provided some information about the Raptor PSA to Carrizo as part of its effort to get Carrizo to reconsider. 8RR61.

Carrizo's CEO Johnson met with other Carrizo executives, as well as Laufer, to "reevaluate this [request] and try to figure out what to do." 10RR72-73. Carrizo reconsidered the facts, but came to the same conclusion. Johnson too felt no compunction to explain the decision to BSR based on the Farmout Agreement's hard-consent clause. 10RR115. Johnson was aware that Carrizo had itself paid for consents in other transactions, but decided not to explore that option with BSR. 10RR76,115-16. Instead, Johnson proposed a different solution—to sell Carrizo's entire leasehold in the Parkey Lease outright to BSR for $5 million, which approximated Carrizo's un-recouped investment in the Lease. 8RR165-66;10RR65,75-76,79-80;PX233(DX56). As Shaver acknowledged, a sale of the leasehold interest would have solved BSR's problem because BSR then could have assigned its rights to anyone it chose. 7RR258;10RR75-76. And Carrizo would have no exposure to the landowner for Raptor's operations on the land. 10RR75-76. The quoted price term was one that BSR's own witness, Ray Kasino ("Kasino"), admitted would be reasonable. 5RR109-10. But BSR never reached out to anyone but Laufer and only then to criticize the offer. 7RR190-91. Raptor's President and CEO, Jason Perkins, later testified that Raptor would have closed the PSA had BSR

12

delivered unclouded title to the Parkey Lease. 1stSuppRR-JX1(Exhibit B) at 70. Although Shaver testified that the sale to Raptor was "too important" to "give up," he also stated that he never countered the proposal nor sought to acquire the necessary rights for any price. 7RR182;8RR134-35. And unbeknownst to Carrizo, BSR represented to Raptor that Carrizo's consent was not in fact required for BSR to make a valid assignment to Raptor, offering to indemnify Raptor for any harm that might result from an assignment without Carrizo's consent. DX58 at BSR002303.[13] BSR stated that it was "of the opinion that the granting of Carrizo's consent to assignment of the Carrizo Farmout *is not necessary to make the assignment of BSR's rights to [Raptor] legally effective*" and that "the only material legal consequence of failure to obtain such consent is that Carrizo might seek to recover damages . . . ." *Id.* at BSR002302 (emphasis added).

A focal point of BSR's at trial was Ruddock's suggestion to Laufer that Carrizo consider dealing "with Raptor directly and cut out [BSR]." DX45. BSR's counsel thought this email set out an unlawful "plan" to blow up the Raptor PSA. *E.g.*, 8RR258;10RR235-36,239. But Carrizo's management rejected this idea out of hand. 6RR213,216;8RR78,240-41. Raptor's President, Perkins, confirmed that no

---

[13] The indemnification letter was excluded from the jury. 7RR12,15. But BSR's position in that letter is a correct statement of Texas law. Carrizo could not void an assignment to Raptor without its consent, it could only sue for any damages resulting from its lack of consent to the assignment. *See* Argument, part V.B.

one with Carrizo ever contacted Raptor about the PSA or the Parkey Lease. 1stSuppRR-JX1(Exhibit B) at 31,41.

BSR also alleged that Carrizo had tried to "squeeze" it by extending the lease-purchase offer so close to the July 3 closing date for the PSA. But on July 2, 2012—the day before the anticipated closing date—BSR's attorney, Ronald D. Krist ("Krist") sent a letter to Carrizo, threatening suit and giving Carrizo until July 9 to capitulate. DX57.[14] BSR also sent Raptor a letter offering both to further extend the closing to July 10 and to indemnify Raptor "from and against any and all loss of title to the portion of the [PSA] assets . . . burdened by the Carrizo Farmout as a result of the failure to obtain Carrizo's written consent to the assignment . . . ." DX58 at BSR002303. Carrizo argued that the letter was relevant to the timing of Carrizo's offer in relation to the Raptor closing and, more importantly, evidence of BSR taking a contrary legal position that Carrizo's consent was *not* required to close the Raptor deal. *E.g.*, 7RR12-13;10RR116-17,127-28 (bill of exceptions). However, the court did not allow Carrizo to present this evidence to the jury or discuss its importance. 13CR3064.

Raptor eventually terminated the PSA, citing Carrizo's failure to consent as the reason. 7RR194.

---

[14] That letter too was excluded from the jury despite the fact that it was also referenced and even displayed in the videotaped deposition of Gregg Evans offered by BSR. 7RR139-40.

14

### D.  BSR Files Suit

BSR sued Carrizo for its refusal to consent and also for fraud, tortious interference, and various causes of action.  1CR1-7.  Although it initially filed suit in its personal capacity, 1CR1-7, BSR later claimed to represent the Exploration Partners as well.  *E.g.*, 10CR2411.

Before trial, BSR obtained limine and other pretrial rulings to hide from the jury evidence that was essential to a full understanding of the dispute.  13CR3063-64;13CR3065-66;13CR3073; 13CR3081.  For example, Carrizo unsuccessfully attempted to introduce evidence of the parties' negotiations.  *E.g.*, 5RR242-54;10RR101-10.  After BSR opened the door to this evidence by introducing prior drafts of the Farmout Agreement, the district court still excluded evidence showing that the parties had deleted the "not to be unreasonably withheld" clause.[15]  The court would not even permit the Carrizo witnesses to testify about their understanding of the "hard consent" provision in the Farmout Agreement.  7RR74-79,100,102,107-08,130-32.[16]  Nor could they explain that a key basis for Carrizo's election was that

---

[15] Instead, the court declared a mistrial *sua sponte* when **BSR** inadvertently violated the limine order it had obtained by offering the prior drafts.  5RR206;7RR110.  The parties were able to craft an instruction to avoid the mistrial.  5RR209,220-21.  But the court ordered Carrizo not to examine the witnesses about these two prior drafts, 5RR209-12, so Carrizo was only able to elicit that testimony in a bill of review.

[16] At one point in the trial, Carrizo's counsel asked if he could ask Carrizo's COO Fisher a single question about his reasons for refusing the consent, and the court said, "I'll let you ask the question why.  If he answers it like I think he'll answer it, then we'll be okay.  If he doesn't, they're going to be objecting, and I may very well grant a mistrial at that point."  7RR132.  As stated above in note 15, this was not the trial court's first suggestion of mistrial based on BSR's violation of its

it had no contractual obligation to consent. *Id.* The court also precluded attempts to draw comparisons between other contracts having the "not to be unreasonably withheld" qualifier and the Farmout, as well as Carrizo's proffer of other contracts where Carrizo had paid in order to obtain a consent to assign. DX64;7RR6,10. The district court recognized that its ruling would "basically eviscerate" Carrizo's business justification defense to the tortious interference claim. 7RR83,109. But it held to its decision throughout the trial.

The Preliminary Closing Statement for the Raptor PSA showed that BSR would receive a profit of $1.358 million at closing—not the entire $27 million purchase price of the Raptor PSA. DX32. Instead, the $25 million balance of the purchase price was owed to the Exploration Partners. *Id.* Suppressing that document, BSR was permitted to argue that it should recover 100% of the purchase price. 10RR248 (closing argument).

BSR's omission of any discussion of the Exploration Partners' recovery under the PSA was a deliberate trial strategy. When Carrizo's counsel indicated that the lack of their participation could not be fixed after trial, BSR's counsel confirmed

own limine order. The Carrizo witnesses were so concerned about violating the limine order that it impacted their credibility before the jury. 7RR32 (Fisher asking Carrizo's counsel if he could answer the question); 8RR204 (Carrizo's counsel pointed out that Laufer was looking to him for permission to answer because of the limine order).

that BSR was "bearing the risk of being wrong. And if we're wrong, we're wrong 100 percent because we're not going to put on proportionate damages." 5RR235.

BSR also opened the door to admission of its proposed indemnification letter to Raptor, DX58, when it presented the video deposition of Raptor's president, Jason Perkins, in which he testified about the indemnity letter. *See* 1stSuppRR-JX1(Exhibit B) at 65,70-73;7RR12. The trial court excluded the letter even though it contained BSR's concession that Carrizo's consent was not necessary to consummate the Raptor PSA. 7RR12,15.

## E.     The Jury Is Instructed and Reaches a Verdict

The trial court denied Carrizo's motion for directed verdict, 15CR3543-67;10RR131-37,139-41,143-44, and instead instructed the jury, over Carrizo's objections, 10RR147-52, as follows:

> You are instructed that the Farmout Agreement is silent about the reasons under which Carrizo could refuse consent to BSR's assignment of the Farmout Agreement to Raptor. Therefore, you may consider evidence of industry custom and expectations in deciding whether Carrizo breached its agreement with BSR. BSR contends that there was a custom and usage in the oil and gas industry that a consent to assignment not be unreasonably withheld. . . .

13CR3180.

In Question 2, the trial court instructed the jury to determine "[w]hat sum of money . . . would fairly and reasonably compensate BSR for its damages, if any, that resulted from Carrizo's failure to comply . . . ." 13CR3181. The jury was further

17

instructed to award the "difference if any between the purchase price in the Raptor PSA and the fair market value, if any, of the remaining interests held by BSR on July 5, 2012, that was a natural, probable, and foreseeable consequence of Carrizo's failure to comply with the Farmout Agreement." *Id.* The jury awarded $27,690,466.86, *id.*—to the penny, it was the full estimated purchase price of the Raptor PSA. DX34 at BSR000985.

The jury also found that Carrizo committed fraud against BSR and intentionally interfered with the PSA and that Carrizo lacked a good-faith belief it had the legal right to withhold its consent. 13CR3182-83. It awarded damages on the tort claims in the amount of $1.7 million, although the tort damages instruction was identical to the contract damages instruction. 13CR3184.

The trial court entered judgment on the contract verdict. It awarded $1.018 million in attorneys' fees based on the court's *in camera* review of unredacted attorney's invoices that were never produced to Carrizo. 14CR3483. The trial court denied Carrizo's request to review the unredacted attorney's invoices before making its ruling. 14CR3485-87,3493,3499-3500; 15CR3501-04. The trial court also awarded BSR $2.9 million in prejudgment interest. 15CR3528. Carrizo timely filed motions to disregard the jury's findings, for a new trial or alternatively remittitur, and to modify the judgment. 15CR3543-79;1stSuppCR6. The court denied these

18

motions on March 2, 2015, and Carrizo timely filed its notice of appeal on April 2, 2015.  15CR3604-8.

## SUMMARY OF ARGUMENT

The Farmout Agreement unambiguously required Carrizo's written consent to any assignment by BSR.  Period.  End of story.  The trial court should have respected the parties' agreement—as expressed within the four corners of the written contract they signed—and rendered judgment for Carrizo.

The trial court instead allowed BSR to rewrite the story.  It did so by keeping from the jury all evidence of the parties' actual negotiations, agreement, and intent—as confirmed by BSR's own testimony—instructing the jurors that the agreement was "silent about the reasons under which Carrizo could refuse consent to BSR's assignment,"[17] and admitting evidence that contradicted the Farmout Agreement under the guise of "custom and usage."[18]  The trial court went so far as to instruct the jury that "BSR contends that there was a custom and usage in the oil and gas industry that a consent to assignment not be unreasonably withheld."[19]  The district court thus instructed the jury that it could find the very language in the Farmout Agreement that BSR was unable to obtain through negotiation.  BSR's subsequent

---

[17] 13CR3180.

[18] *Id.*

[19] *Id.*

19

remorse over the bargain it unquestionably struck cannot support the extraordinary remedy of implying a covenant and inserting language that was deliberately excluded by agreement of the parties. And BSR cannot meet the demanding standards for implying such a promise.

Even if the jury could have properly considered custom and usage, BSR failed to produce admissible proof to substantiate a finding of an industry custom concerning consents to assign. BSR's sole proof of the supposedly prevailing trade custom and usage on consent provisions was the subjective, unsubstantiated, and unreliable opinion of an expert who has never negotiated such a contract and could not identify a single objective source to support his view.

The $27.6 million contract damages awarded by the jury were overly inflated, as BSR was not entitled to recover on behalf of the Exploration Partners.[20] The sole source of the damages award was the PSA between BSR and Raptor, as the jury awarded the purchase price of that agreement—to the penny.[21] Under the PSA, however, BSR was not the sole "Seller"—and not the sole entity to recover proceeds from the PSA. Instead, BSR was poised to recover only a fraction of the purchase price in its own right. Nor did the PSA give BSR the right to sue on behalf of the

---

[20] The other Sellers for purposes of the PSA are listed in an appendix to the PSA and have been represented to be BSR's Exploration Partners.

[21] 13CR3181.

Exploration Partners; instead, the record negated any argument that BSR and the "Exploration Partners" were, in fact, partners. To the extent that BSR recovered on claims or damages owned solely by its Exploration Partners: (i) BSR has provided no proof that the Exploration Partners assigned any causes of action against Carrizo to BSR; (ii) the Exploration Partners lack standing to pursue any claims against Carrizo; and (iii) the Exploration Partners have not offered any evidence to support any element of the claims BSR purported to bring on their behalf. And there is no pleading or proof to support any argument that BSR was entitled to sue on behalf of the Exploration Partners on "partnership" grounds.

Once the Farmout Agreement is properly construed, BSR's tort claims also fail. BSR could not justifiably rely on a promise that is expressly contradicted by the Farmout itself. And Carrizo's justification defense to the tortious interference claim was established as a matter of law because Carrizo had the unqualified right under the Farmout Agreement to refuse consent.

Evidentiary and jury instruction errors independently provide grounds to reverse the judgment. Finally, the trial court's unauthorized use of *in camera* review of BSR's fee bills to make fact findings to support a $1 million award of attorneys' fees requires that part of the judgment to be set aside.

## I. The Trial Court Erred by Not Enforcing the Unambiguous Plain Language of the Farmout's Hard-Consent Provision

### A. Standard of Review

In construing a written contract, the court's primary concern is to ascertain the parties' true intentions as expressed in the instrument. *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 867 (Tex. App.—Tyler 2010, pet. denied). If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, the court will construe the contract as a matter of law. *Id.* The interpretation of an unambiguous contract is a question of law, which this Court reviews *de novo*. *Id.*; *see also Dynegy Midstream Servs., L.P. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

### B. The Plain Language of the Farmout Expresses an Agreement to an Unqualified "Hard Consent"

A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol evidence rule. *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). To determine the parties' intent, courts must examine the express language of their agreement. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). To achieve this objective, the terms of the contract are given their plain and

ordinary meaning unless the agreement indicates the parties intended a different meaning. *Reeder v. Wood Cty. Energy,* LLC, 395 S.W.3d 789, 794-95 (Tex. 2012). No other words varying the terms or contradicting the legal effect of an unambiguous written instrument are to be added or subtracted. *See Johnson v. Driver*, 198 S.W.3d 359, 363 (Tex. App.—Tyler 2006, no pet.).

Carrizo and BSR directly addressed the issue of assignment—the consent provision of the Farmout Agreement states that BSR may not assign its rights without Carrizo's written consent. The Agreement imposes no restriction on Carrizo's right to withhold such consent—Carrizo has the unqualified right to grant or withhold its consent for any reason or no reason. An unqualified no-assignment-without-consent provision is "designed to give the parties some degree of control over with whom they do business and nothing more. This language was obviously intended to render the [] agreement unilaterally unassignable." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 596 (Tex. 1992); *see also* Davis, *Preferential Rights to Purchase and Consents to Assign*, at 22 (App. 6) (noting that "hard" consents "are common and generally enforceable" in oil and gas leases: "Courts take such provisions at face value, and have been unwilling to imply a covenant that the consent cannot be unreasonably withheld if such a covenant is not included in an agreement." (citing *Reynolds v. McCullough*, 739 S.W.2d 424, 429 (Tex. App.—San Antonio 1987, writ denied)). Yet the district

23

court suggested in the court's charge that there must be "reasons under which Carrizo could refuse consent to BSR's assignment" and credited BSR's contention that "custom and usage in the oil and gas industry" provides that "a consent to assignment [may] not be unreasonably withheld." 13CR3180. That suggestion and characterization pervert the legal effect of the Agreement's express language. *See* parts II & IV, *infra*; *see also Johnson*, 198 S.W.3d at 363.

The parties could have, but did not, include a reasonableness restriction in the consent provision. *See, e.g.*, Allen D. Cummings, *Consent Asked For – But Not Received: The Enforceability of Consent to Assignment or Transfer Provisions*, 38th Annual Ernest E. Smith, OIL, GAS & MINERAL LAW INST. (Mar. 30, 2012) (discussing various forms of assignability provisions). In fact, BSR entered into several such agreements with other parties. *See* DX66. Here, the parties expressly deleted that language, and so BSR could not reinsert a reasonableness condition. *Kachina Pipeline Co. v. Lillis*, No. 13-0596, 2015 WL 5889109, at *6 (Tex. Oct. 9, 2015) ("[O]ur task is to interpret the [contract's] language, not to justify the bargain it memorializes.").

Because Carrizo was not obligated to consent or to provide any reason for refusing to agree to an assignment, it could not have breached the Farmout Agreement by withholding its consent to the assignment to Raptor. The district court erred in submitting the contract claim to the jury, and there is no evidence supporting

the jury's finding of breach in answer to Question 1. 13CR3180. The judgment should therefore be reversed and rendered in favor of Carrizo.

## II. The Farmout Agreement Leaves No Room for Implying a Covenant—Especially One that the Parties Expressly Rejected

### A. Standard of Review

Because the obligation that Carrizo could not unreasonably withhold its consent to assignment is not contained in the four corners of the Farmout, any duty in that regard would have to occur implicitly. Determining whether a duty arises by implication is a matter of law for the court rather than a question of fact for the jury. *See, e.g.*, *Weil v. Anne Lewis Shops, Inc.*, 281 S.W.2d 651, 655 (Tex. Civ. App.—San Antonio 1955, writ ref'd) (detailing principles governing "the exercise of judicial authority to insert implied covenants"). The trial court's decision to imply a covenant is reviewed *de novo*. *Id.* at 656 (court of appeals reviewed lengthy contract, and construing it as whole, saw "no reason to write into this contract a stipulation which the parties themselves did not see fit to place therein . . .").

### B. The Trial Court Erred in Allowing the Jury to Imply a Covenant That Does Not Exist in the Contract

Texas disfavors implied covenants. *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 748 (Tex. 2003); *see also HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex. 1998) ("This Court has not lightly implied covenants. . . . Our decisions have repeatedly emphasized that courts

25

"'cannot make contracts for [the] parties. . . .'"). This has been the law in Texas for decades:

> [W]hen parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole. An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and ***it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it***, and therefore omitted to do so, ***or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument***.

*Danciger Oil & Ref. Co. of Tex. v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941) (emphasis added); *see also Renaissance Women's Group*, 121 S.W.3d at 748. The exacting standard is warranted because implied covenants are ***not*** to be used "to achieve what it believes to be a fair contract or to remedy an unwise or improvident contract. . . ." *HECI*, 982 S.W.2d at 888-89.

In *Reynolds v. McCullough*, 739 S.W.2d at 429, the court held that "[a] lessor may contract, by provision in the lease, not to unreasonably withhold his consent to an assignment . . . of the premises. This type of provision is in the nature of a promise or covenant which, if breached, could be grounds for an action for damages." The court held that ***"[a]bsent this promise***, . . . there is no implied covenant by the lessor to act reasonably in withholding his consent." *Id.* (emphasis added); *see also Trinity Prof'l Plaza Assocs. v. Metrocrest Hosp. Auth.*, 987 S.W.2d 621, 625 (Tex. App.—

Eastland 1999, pet. denied) (reaffirming the principle espoused in *Reynolds*, which "correctly stated the rule"). Consequently, many contracts qualify the right of one or more parties to withhold its consent to a future assignment. *See, e.g., Lubbock Cty. Water Control and Imp. Dist. v. Church & Akin, L.L.C*. 442 S.W.3d 297, 299 (Tex. 2014); *Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd*., 123 S.W.3d 735, 747 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Thompson v. CPN Partners, L.P*., 23 S.W.3d 64, 69-70 (Tex. App.—Austin 2000, no pet.). In fact, BSR had entered into a number of other contracts containing that same language. DX66. And the Raptor PSA required Raptor's consent to any assignment by BSR and the other Seller—without any reasonableness restriction on Raptor's right of consent. DX34 at BSR001022. BSR clearly understood the difference between a "hard consent" and a qualified, "not to be unreasonably withheld" provision. 5RR246-49; 10RR118-20 (Bertram and Shaver's testimony in bills of exceptions).

It is not true that a reasonableness condition regarding consent to assignments was "so clearly within the [parties'] contemplation … that they deemed it unnecessary to express it." *Weil*, 281 S.W.2d at 655. The contrary is true—the parties ***did not*** intend a reasonableness qualifier to restrict Carrizo's consent. During the course of the parties' negotiations, their experienced negotiators exchanged multiple drafts of the Farmout. 5RR159-60,243-54;7RR142-43;10RR118-19. Language qualifying that Carrizo's consent to assignment would "not be

27

unreasonably withheld" was expressly rejected, stricken from later drafts, and ultimately not included in the final Agreement both Bertram and Shaver signed. *Compare* DX18 *with* DX 20;PX36. Bertram and Shaver considered the deletion a material change and were aware of the plain meaning of the consent provision without the qualifier—that is, that Carrizo could withhold consent, even unreasonably. 5RR248-51;10RR118-19. But after discussion between themselves and Carrizo and reurging Carrizo to reinsert the reasonableness restriction—which Carrizo refused—they signed the Agreement anyway. 5RR248-51;10RR118-19;PX36.

As was the case in *Weil*, the Farmout Agreement "seems to cover the parties' entire understanding. It is plain and unambiguous, and we see no reason to write into this contract a stipulation which the parties themselves did not see fit to place therein . . . ." *Weil*, 281 S.W.2d at 656. The Court should not permit BSR to belatedly rewrite the contract through the guise of an implied covenant in order to avoid an agreement BSR freely and knowingly entered at the time of its execution. *HECI*, 982 S.W.2d at 888-89.

## III. The Exclusion of Uncontroverted Evidence That the Parties Agreed to a Hard Consent Compounded the Error in Misconstruing the Agreement

### A. Standard of Review

A trial court's exclusion of evidence is reviewed for abuse of discretion. *See Lively v. Blackwell*, 51 S.W.3d 637, 641 (Tex. App.—Tyler 2001, pet. denied). The

28

district court excluded a wide swath of evidence based on its erroneous reading of the parol evidence rule, and its decision on that legal issue is reviewed *de novo*. *Dyer v. Cotton*, 333 S.W.3d 703, 718 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

**B.     Evidence of Carrizo and BSR's Prior Negotiations Is Admissible**

The intentional absence of any restriction on Carrizo's ability to withhold consent is substantiated by the parties' deletion of such a qualifier from an initial draft of the Farmout Agreement. *See* parts I & II; *see also* 5RR250 (BSR's Bertram testifying on bill of exceptions that he understood that the Farmout Agreement as ultimately executed permitted Carrizo to withhold its consent "[f]or any reason."). At BSR's urging, the trial court excluded all of this evidence of the parties' negotiations, including the draft deletion, finding it to contravene the parol evidence rule. *E.g.*, 13CR3063-64;13CR3067-78;13CR3080-82;13CR3084-89. BSR took full advantage of the omission to suggest that no reasonable company would have agreed to a hard consent:

> Q:     Can you imagine anybody in the oil business signing one of these agreements where Carrizo wrote in there, "Oh, by the way, we can deny consent for an illegal reason"?
>
> A:     No.
>
>                    *              *              *
>
> Q:     Would you allow your clients to sign that?
>
> A:     No, I would not.

6RR107-08.

The parol evidence rule precludes considering evidence that would render a contract ambiguous when—as here—the document, on its face, is capable of a definite legal meaning. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981). The rule does not prohibit courts from considering the facts and circumstances regarding the contract's negotiation and execution "that inform the contract text and render it capable of only one meaning." *Americo Life*, 440 S.W.3d at 22; *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (holding that parol evidence rule does not "prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text").

In this context, "[n]egotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole." *Houston Expl.*, 352 S.W.3d at 469-70 (citation omitted). In particular, evidence of the deletion made to the draft Farmout Agreement during the parties' negotiations demonstrates an intent ***not*** to impose any conditions on Carrizo's right to withhold written consent. It is therefore valid evidence, and the trial court erred in excluding it. *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 735 (Tex. App.—San Antonio 2014, pet. denied) (holding that deletions and revisions in oil and gas lease drafts were relevant as tending to demonstrate the intent of the parties in selecting language used, were not barred by the parol evidence rule,

30

and thus trial court's refusal to admit drafts containing stricken text was abuse of discretion); *see also BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 500 (Tex. App.—San Antonio 2013, pet. denied) ("'[N]egotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated.'" (quoting *Houston Expl.*, 352 S.W.3d at 470 n.28)).

"Quite simply, the parties could not have intended for the law to engraft into their agreement the very language they removed." *PNP*, 438 S.W.3d at 737. Admission of evidence regarding the negotiations and prior drafts was thus permissible and appropriate even if offered only to clarify the parties' intentional decision to delete the reasonableness qualifier.

## C. The Trial Court's Erroneous Resort to Custom and Usage Evidence Required Admission of the Prior-Negotiation Evidence

The excluded evidence was necessary to refute the erroneously admitted "custom and usage" evidence BSR introduced to create a reasonableness restriction out of whole cloth. *See* part IV, *infra*.

Instead of respecting the agreement that the parties actually made, the trial court adopted BSR's proposal and instructed the jury to consider "industry custom and expectations." 13CR3180. In the oil and gas industry, "custom and usage" testimony is ordinarily used to explain technical terms. *See, e.g.*, *Oil Ins. Ass'n v. Royal Indem. Co.*, 519 S.W.2d 148, 150 (Tex. App.—Houston [14th Dist.] 1975,

31

writ ref'd n.r.e.). "Reasonableness" is not a technical term that needs explanation by an expert. And in any event, evidence of custom and usage "is not competent to contradict the plain and unambiguous terms of an express contract nor to vary, control, impair, restrict, or enlarge the explicit language of the agreement." *Corso v. Carr*, 634 S.W.2d 804, 808 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.).

Recently, in *Kachina Pipeline*, the Supreme Court of Texas held that "industry custom cannot impose obligations beyond those within the written Agreement." 2015 WL 5889109, at *6. In that case, as here, the respondent argued that a particular term had to be read into the parties' agreement to honor industry custom. Specifically, the parties disputed whether a natural-gas-purchase agreement between a producer and pipeline operator entitled the pipeline operator to deduct compression costs for the gas from its payments to the producer. *Id.* at *1. Their agreement provided that "[i]f Buyer installs compression to effect delivery of Seller's gas, Buyer will deduct from proceeds payable to Seller hereunder a value equal to Buyer's actual costs to install, repair, maintain and operate compression . . . ." *Id.* at *3. The pipeline operator interpreted that contract provision to apply to any compression that aided in the final delivery of gas to the resale purchaser and so deducted all costs of compression from the producer's share. *Id.* Amici argued in support of the pipeline operator's interpretation, claiming that "downstream centralization of compression is both common and critical to the efficient

transportation of gas to market." *Id.* at \*6. The court "did not doubt that" or the fact that "producers often contract to share in such costs." *Id.* But those industry realities did not change the contract the parties made: "[T]he Agreement does not express an objective intent that [the producer] would [share these compression costs], and industry custom cannot impose obligations beyond those within the written Agreement." *Id.*

In the trial court, BSR relied on *Energen Res. MAQ, Inc. v. Dalbosco*, 23 S.W.3d 551 (Tex. App.—Houston [1st Dist.] 2000, pet. denied),[22] for the proposition that custom and usage evidence can be used to fill in terms where a contract is "silent." *Dalbosco* cannot be reconciled with the Supreme Court's pronouncements: "[I]ndustry custom cannot impose obligations beyond those written within the Agreement." *Kachina Pipeline*, 2015 WL 5889109, at \*6. Moreover, *Dalbosco* does not apply here because there is no silence on whether Carrizo had to consent in writing to any assignment by BSR.

---

[22] Notably, *Dalbosco* relies on decisions from 1923 and 1940 to support its analysis of custom and practice. *See Energen Res. MAQ, Inc. v. Dalbosco*, 23 S.W.3d 551, 556 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (collecting cases). And it ignores the legions of recent opinions of the Texas Supreme Court emphasizing the need to respect the agreements actually made by the parties and disfavoring implied covenants. *E.g., Kachina Pipeline Co. v. Lillis*, No. 13-0596, 2015 WL 5889109, at \*6 (Tex. Oct. 9, 2015).

This aspect of the trial court's disposition requires reversal and remand for a new trial in which evidence of the parties' negotiations and the context of their agreement is fully considered by the jury.

## IV. The Trial Court Erred in Admitting BSR's Evidence Regarding Custom and Usage

### A. Standard of Review

BSR's sole proof on "custom and usage" was the expert testimony of Bruce Kramer.[23] Rulings on the admissibility of expert testimony are reviewed for abuse of discretion. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). "Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion." *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347-48 (Tex. 2015) (internal quotations and citation omitted).

In order for expert testimony to be admissible: (1) the expert must be qualified; (2) the testimony must be relevant; and (3) the testimony must be based on a reliable foundation. *Id.* at 348 (citation omitted); *Robinson*, 923 S.W.2d at 556; TEX. R. EVID. 702. Reviewing the record as a whole, BSR's expert testimony regarding custom and usage did not satisfy these requirements. Thus, the trial court

---

[23] Carrizo challenged the admissibility of Kramer's testimony by filing a Motion to Exclude Expert Testimony of Bruce M. Kramer, 10CR2470-11CR2535, and renewed its objection at trial, 6RR19. The trial court denied all of these challenges. 13CR3025;1stSuppCR5;6RR19.

erred in admitting that testimony, and that error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1.

**B.      Kramer's Testimony Failed to Satisfy the Proof Requirements for Custom and Usage and Therefore Constitutes No Evidence**

In order to constitute an element of a contract, a custom "must be either shown to have been known personally to the parties to the contract, or to have been so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it." *State Nat'l Bank of Hous. v. Woodfin*, 146 S.W.2d 284, 286 (Tex. Civ. App.—Galveston 1940, writ ref'd); *XTO Energy Inc. v. Smith Prod., Inc.*, 282 S.W.3d 672, 682 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (no proof that custom and usage was so universal that parties were charged with knowledge of its existence).

Kramer did not testify—and there was no other evidence—that Carrizo operated on any understanding that, as a matter of "custom," in the oil and gas industry, consent to an assignment can never be unilaterally withheld. Kramer did not dispute that Carrizo thought it had a hard consent. Nor did Kramer demonstrate that the alleged "custom" was "so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it" as required by law. Given the parties' prior dealings regarding that provision, which were improperly excluded by the trial court, Kramer could not possibly satisfy the proof requirements for custom and usage.

35

### C. The Trial Court Erred in Admitting Kramer's Opinions Regarding Custom and Usage

#### 1. Kramer was not qualified to testify regarding custom and usage with respect to the Farmout Agreement

A witness may be qualified as an expert "by knowledge, skill, experience, training, or education." TEX. R. EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). But an expert need not just be well-credentialed; rather, he must be qualified with respect to the particular issue that is the subject of his testimony. "The offering party must demonstrate that the witness 'possesses special knowledge as to the very matter on which he proposes to give an opinion.'" *Gammill*, 972 S.W.2d at 718 (citation omitted).

Kramer was not qualified to testify that custom and usage in the oil and gas industry requires that consent to an assignment not be unreasonably withheld. Kramer, a law professor, testified that he had never:

- been employed as an employee of an oil and gas company or served as a lease scout, landman, or in-house counsel;

- prepared or negotiated a farmout agreement or purchase and sale agreement;

- implemented the terms of a sale between the execution of the purchase and sale agreement and the closing;

- conducted negotiations between the execution of a purchase and sale agreement and the closing; or

36

- decided whether to grant consent or not under a consent-to-assign provision.

6RR72-74,85. Kramer admitted he had no practical experience or skill in negotiating, drafting, executing, or fulfilling any consent-to-assign provision in a contract and has no particular training or education with regard to consent-to-assign provisions. *Id.*

Kramer's *only* basis for his consent-to-assign testimony is his "study of oil and gas law," "participation" in the industry for the last 30 years, and "discussions with people in the industry." 6RR84-85. He could not identify any treatise or other authoritative source that is "definitive in terms of custom and practice of the industry." 6RR84,86,105-06. Talking to "people" "about farmout agreements" does not qualify Kramer to opine that industry custom requires that a withholding of consent under such agreements be reasonable. *See Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 443 (Tex. App.—Texarkana 2010, no pet.) (expert's experience should be closely tied to opinions he is providing). But even if it did, Kramer admitted that he had no specific recollection of any such conversations. 6RR84,86,105-06.

### 2. Kramer's testimony regarding custom and usage was not relevant

Evidence that has no relationship to any issue in the case does not satisfy Rule 702 and is thus inadmissible under Rule 702, as well as Rules 401 and 402. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Expert testimony that does

not comply with the applicable legal standard is also irrelevant. *Id.* at 630-31 (expert testimony that reflected enhancement in land value due to condemnation was irrelevant when law provided that value because of a condemnation project is not value for which a landowner may recover).

Kramer's opinion was not relevant because it was not based on the facts of this case. Kramer ignored that the parties specifically negotiated the consent-to-assignment provision and Carrizo deleted proposed language requiring consent not to be unreasonably withheld. *See* part III, *supra*.

Kramer also failed to prove a "custom" that consent to assignment cannot be unreasonably withheld was "so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it." *Woodfin*, 146 S.W.2d at 286; *see also* part IV.B. It was therefore irrelevant and inadmissible.

### 3. Kramer's testimony regarding custom and usage was not reliable

An expert's testimony must also be reliable and rest upon a reliable foundation. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009). "'[E]ach material part of an expert's theory must be reliable.'" *Gharda*, 464 S.W.3d at 349 (quoting *Camancho*, 298 S.W.3d at 637).

Kramer's testimony does not satisfy this standard. His testimony was based, at most, on his general study of oil and gas law and discussions with unnamed

38

sources at unspecified times. 6RR84,86. Kramer could not identify a treatise, case, law review, article, or any other industry publication regarding custom and usage with respect to the consent-to-assign provision. 6RR84,86,105-06. Thus, Kramer's testimony was not based on objectively verifiable sources and was merely "conclusory." *See, e.g., Owen v. Talbot*, 441 S.W.2d 887, 888-89 (Tex. Civ. App.—Texarkana 1969, writ ref'd n.r.e.) (testimony that the custom and usage with respect to a bailee's liability for loss of cattle was "common among the cattle people in Bowie County" was "conclusory evidence"); *Wolert v. Arledge*, 4 Tex. Civ. App. 692, 23 S.W. 1052, 1053 (1893) ("Usage must be proved by evidence of facts, not by mere speculative opinions . . .").

Because all Kramer brought to the table were his credentials and a subjective and conclusory opinion that custom and usage imposed upon Carrizo an obligation not to unreasonably withhold its consent to assignment, Kramer's testimony amounted to no evidence and should have been excluded. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997).

## V. The Contract Damages Awarded by the Jury Lack Legally and Factually Sufficient Proof in the Trial Record

### A. Standard of Review

In the trial court, Carrizo challenged the lack of legally and factually sufficient evidence to support the jury's finding of $27.6 million in contract damages awarded to BSR. *E.g.*, 13CR3158-76;15CR3543-67;10RR131-34,151.

39

A "no evidence" challenge should be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). If the evidence is so slight as to make any inference of a fact only a guess, it constitutes no evidence at all. *Id.* at 813.

An immaterial jury finding must be disregarded. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). "A question is immaterial when it should not have been submitted," where the question calls for a "finding beyond the province of the jury," or "when it was properly submitted but has been rendered immaterial by other findings." *Id.*; *see also Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999).

Further, a judgment based on a jury verdict should be reversed when the damages are manifestly too large. TEX. R. CIV. P. 320. The jury's contract damage findings were legally unsupportable, contrary to undisputed evidence, and so excessive that they should be entirely disregarded, or at the very least, a new trial should be granted. Alternatively, this Court can and should suggest a remittitur of the contract damages. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.

1987) ("If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict."); *see also* 15CR3543-67.

**B.      The $27.6 Million Contract Damages Award Necessarily and Improperly Includes Compensation for the Exploration Partners**

In Question 2, the trial court instructed the jury to determine "[w]hat sum of money . . . would fairly and reasonably compensate ***BSR for its damages***, if any, that resulted from Carrizo's failure to comply . . . ." 13CR3181 (emphasis added). But BSR never proved any damages that it suffered. Instead, BSR sought and recovered the entire purchase price of the Raptor PSA—to the penny—as ***BSR's damages*** through Question 2. *Compare* DX34 at BSR00985 *with* 13CR3181.[24]

The purchase price of the PSA belonged to BSR ***and*** the many other Sellers (Exploration Partners) under the agreement. The PSA provided that BSR was to receive the "purchase price" of "approximately $27,690,466.86" ***on behalf of*** the other Sellers (Exploration Partners) and then "distribute the proportionate shares due the other Sellers" within 10 days. DX34 at BSR000985.[25] BSR is not an appropriate recipient of the full Raptor purchase price.

---

[24] In its Original Petition, BSR sued Carrizo—solely on its own behalf—for the same causes of action on which BSR recovered at trial and alleged nearly an identical amount of damages—$28,000,000. *Compare* 1CR1-7 *with* 10CR2311,2437,2439. (The version of the Fourth Amended Petition in the Clerk's Record is out of order, with the exhibits interposed between pages of the pleading, which is why the citations to that record sometimes span a number of pages.)

[25] BSR claimed to sue as an assignee and attached the assignments to its Fourth Amended Petition, 10CR2311-52, but offered no evidence concerning the alleged assignments at trial.

41

BSR suppressed the only document that in any way evidenced the compensation that it would have received had the Raptor PSA closed. DX32. The Preliminary Closing Statement—a document prepared by BSR that the court kept hidden from the jury—showed that, under the PSA, BSR would have recovered $1.358 million for its profit and been required to distribute $26 million to the Exploration Partners. DX32;10RR120-24. Thus, at best, BSR could have recovered the profits it would have purportedly recovered under the PSA ($1.358 million) less the salvage value of BSR's interest in the Farmout Agreement ($732,548.75 in salvage value of assets remaining with BSR, 8RR130). *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 776 (Tex. 2009) (per curiam) (loss of a separate, third-party contract is a lost-profits analysis, and plaintiff bears the burden of proving its lost profits, which must take into account the value of assets still retained by the plaintiff).

Because the Preliminary Closing Statement was excluded from the jury at BSR's insistence, 13CR3064;4RR21-31;10RR120-25, it cannot now be considered to substantiate BSR's damages in any way. Nevertheless, it conclusively establishes that the $27.6 million awarded by the jury far exceeds any legitimate recovery by BSR.

Because there is no proof in the record of ***BSR***'s damages—as a result of BSR's strategic trial decisions—there is no evidence to support the jury's finding in

42

answer to Question 2, and it should be disregarded and judgment entered for Carrizo on the contract claim. Alternatively, the $27,690,466.86 in damages awarded by the jury is patently excessive and unsupported by factually insufficient evidence, and so the judgment awarding it should be reversed and the cause remanded for a new trial. At the very least, the Court should order a remittitur in the amount of $625,073.70 (representing the $1,357,622.45 profit BSR anticipated under the PSA, DX32, less the salvage value it proved at trial, $732,548.75, 8RR130).

## C. BSR Should Not Have Recovered any Damages on Behalf of the Exploration Partners

BSR sued Carrizo "individually" and as "assignee" of the "other parties" to the PSA. 10CR2311. But BSR was prohibited from suing on behalf of the Exploration Partners as "assignee" because BSR did not satisfy the legal requirements of an assignment. Nor could BSR sue on "behalf" of the Exploration Partners on any other basis. BSR did not allege or prove any other authority for its claimed right to sue on behalf of the Exploration Partners. In fact, BSR successfully sought to keep any evidence of the assignments of interests from the Exploration Partners from the jury. 13CR3063-64;13CR3072-78;4RR22-31. On that basis alone, the judgment should be reversed.

### 1. BSR failed to prove that the Exploration Partners assigned any viable causes of action against Carrizo to BSR

Standing is a fundamental matter of subject-matter jurisdiction that is necessary to entertain a claim. *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015) (per curiam) ("Courts lack subject-matter jurisdiction to adjudicate disputes initiated by parties lacking standing."). In order to have standing to sue on an assigned cause of action, "the party claiming the assigned right must prove a cause of action existed that was capable of assignment and the cause was in fact assigned to the party seeking recovery." *Ceramic Tile Int'l, Inc. v. Balusek*, 137 S.W.3d 722, 724 (Tex. App.—San Antonio 2004, no pet.).

#### a. BSR did not prove that any purported causes of action were assigned to it

BSR's live petition at the time of trial attached assignments from the Exploration Partners. *See, e.g.*, 10RR2311,2435-42. But pleadings are not evidence, and "[s]imply attaching a document to a pleading neither makes the document admissible as evidence, dispenses with proper foundational evidentiary requirements, or relieves a litigant of complying with the other admissibility requirements." *Ceramic Tile*, 137 S.W.3d at 725.

If a party does not offer the actual assignment of a cause of action "into evidence at trial, he does not meet his burden of proving a cause of action existed that was capable of assignment and that the cause was in fact assigned to him." *Id.*;

44

*see also Esco Elevators, Inc. v. Brown Rental Equip. Co.*, 670 S.W.2d 761, 764 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). The assignments are not in the record because BSR persuaded the trial court to exclude them from the jury. *E.g.*, 2RR11-20,13CR3073. Nor was there any other evidence of the assignments at trial. *R&R White Family Ltd. P'ship v. Jones*, 182 S.W.3d 454, 459 (Tex. App.—Texarkana 2006, no pet.) (party offered no testimony or documentary evidence that the cause of action was in fact assigned or even that its existence was ever acknowledged). Because BSR did not show that it was the assignee of any of the Exploration Partners, BSR lacked standing to assert claims on behalf of the Exploration Partners for claims that belong solely to those entities. Consequently, the district court had no jurisdiction over those claims. *Zaan LLC v. Sangani*, No. 05-12-00423-CV, 2015 WL 2398652, at *5 (Tex. App.—Dallas May 20, 2015, pet. filed). This fatal defect infects the damages awarded to BSR and mandates reversal of the judgment below.

**b.  BSR did not prove that the Exploration Partners had any causes of action that were capable of assignment**

Independent of its failure of proof as to the assignments, BSR demonstrated no basis for recovering the Exploration Partners' shares of the PSA. As an alleged assignee of the Exploration Partners' causes of action, BSR may assert only those rights the Exploration Partners themselves could assert. *See, e.g., Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 420 (Tex. 2000); *Flagstar Bank, FSB v. Walker*, 451 S.W.3d 490, 497 (Tex. App.—Dallas 2014, no pet.) (assignee of a cause of

45

action "stands in the shoes of the assignor" and may assert only those rights the assignor itself could assert, "including bringing suit"). The Exploration Partners have no standing to bring claims for breach of the Farmout Agreement between Carrizo and BSR, and BSR likewise was barred from bringing, or recovering on, those claims on the Exploration Partners' behalf.

In order to establish standing to maintain a breach of contract action, a plaintiff who is not a party to a contract must show "either third-party beneficiary status or privity." *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 738 (Tex. App.—Dallas 2007, pet. denied); *see also Redmon v. Griffith*, 202 S.W.3d 225, 239 (Tex. App.—Tyler 2006, pet. denied), *disapproved on other grounds by Ritchie v. Rupe*, No. 11-0047, 2014 WL 2788335 (Tex. June 20, 2014).

The Exploration Partners were not parties to the Farmout Agreement; that contract was made solely between Carrizo and BSR. 7RR237. They were not alleged to be in privity or third-party beneficiaries of the Farmout. 10CR2311, 2440.[26] In fact, BSR never claimed—much less proved—that the Exploration Partners were intended third-party beneficiaries under the Farmout Agreement. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) (Third-party beneficiary contract will not be created by implication; "[t]he intention

---

[26] *See supra* note 28 regarding citations to the Fourth Amended Petition in the Clerk's Record.

46

to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied."); *Paragon Sales Co. v. N.H. Ins. Co.*, 774 S.W.2d 659, 660 (Tex. 1989) (some evidence of standing as a third-party beneficiary must be produced before the opposing party must prove any defenses that would limit or bar recovery by the third-party beneficiary). Instead, BSR admitted that it did *not* enter into the Farmout Agreement on behalf of the Exploration Partners and the contract was not for their benefit. 7RR237. The Exploration Partners thus lacked standing to bring a claim for breach of the Farmout Agreement, and BSR likewise lacked the ability to bring such a claim on their behalf.

BSR instead claimed—for the first time at trial—that it had authority to pursue the claims of the Exploration Partners against Carrizo because of a "partnership" relationship. *E.g.*, 10RR138-42. But BSR did not purport to bring its claims on behalf of any "partnership" between it and the Exploration Partners or on behalf of the "Exploration Partners" as its "partners." 10CR2311-52. Carrizo specifically challenged BSR's standing, 11CR2636-37,2640,[27] and BSR's counsel did not even claim a partnership until it responded to Carrizo's motion for directed verdict. 10RR138. The argument was easily refuted: as Carrizo pointed out to the trial court,

---

[27] Carrizo filed a verified denial asserting BSR's lack of standing or capacity to sue as assignee, which was the only capacity BSR attempted to plead. 11CR2636. BSR cannot now rely on a different ground for its capacity to sue on behalf of the Exploration Partners.

BSR's agreements with the Exploration Partners expressly disclaimed any possibility of a partnership. 10RR140-42,144-45; *see also* DX16 at BSR002384 ("***It is not the intent of the parties hereto to create, nor shall this agreement be construed as creating a mining or other partnership*** or association to render them liable as partners." (emphasis added)). BSR kept the jury from hearing about these entities and represented that it alone was entitled to recover from Carrizo the entire purchase price of the Raptor PSA—notwithstanding the clear terms of the PSA and agreements with the Exploration Partners. *E.g.*, 13CR3063-64;13CR3072-73. Consequently, there is no evidence of any partnership between BSR and the Exploration Partners. BSR's own documents refuted it.

## 2. BSR was not entitled to seek recovery of the Exploration Partners' alleged damages

The damages awarded to BSR were excessive because they included damages that undisputedly belonged to the Exploration Partners. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196-97 (Tex. 1971) (claimant not entitled to recover more than amount required for full satisfaction of ***his*** damages); *Stephenville, N. & S.T. Ry. Co. v. Baker*, 203 S.W. 385, 386 (Tex. Civ. App.—Austin 1918, no writ) ("[I]n any case where the plaintiff is entitled to recover damages, the sum of money, and no more, which is necessary to make fair and just compensation for the injury is the correct measure of damages.").

Not only did BSR fail to prove that it was entitled to recover damages on behalf of the Exploration Partners, *see* part V.B, BSR also failed to prove the amount of damages it was entitled to recover (if any), in its own right. By failing to submit—and in fact successfully keeping out—proof of its proportionate share of recovery under the PSA, BSR failed to prove the amount of damages to which it alone was entitled.

**D.  BSR Lacks Competent, Admissible Proof to Support a Damages Award**

Independent of its erroneous windfall of the Exploration Partners' share, BSR's damage model failed for additional reasons. BSR was entitled to recover only the lost profits it suffered that were proximately caused by the conduct of Carrizo. *See Aquaplex*, 297 S.W.3d at 774, 776. Such profits cannot be speculative or hypothetical, but must be proven with reasonable certainty. *See Phillips v. Carlton Energy Grp., LLC*, 58 Tex. Sup. Ct. J. 803, 2015 WL 2148951, at *9 (May 8, 2015). "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

Although BSR effectively sought benefit of the bargain damages,[28] it erroneously applied that measure to the PSA rather than the Farmout Agreement. BSR was not entitled to recover the benefit of the bargain it made with Raptor from Carrizo—Carrizo was not a party to the PSA. Nor was BSR entitled to recover the benefit of a bargain that was not breached. At best, BSR could recover the profits it would have purportedly recovered under the PSA, less the salvage value of BSR's interest in the Farmout Agreement. *See Aquaplex*, 297 S.W.3d at 776. But BSR put on no evidence of its lost profits under that measure.

To substantiate BSR's eight-figure damage finding, BSR's counsel questioned Shaver about an email containing an approximate value of the purchase price of the Raptor PSA ("$30 million"), 7RR183,210—a number that is not even accurate as to the amount of the purchase price under the written PSA agreement. Further, the face value of the Raptor PSA did not take into account offsets and credits that were expected in order to close the PSA. Whether termed as "expenses," "costs of performance," or "losses," these amounts had to be—but were not—proven and deducted from gross profits or receipts in order to determine the true amount of "lost profits" damages. *See, e.g., Wiese v. Pro Am Servs., Inc.*, 317 S.W.3d 857, 863-64

---

[28] Benefit-of-the-bargain damages are not based on what actually occurred but on what would have occurred had the Agreements been performed. *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 608 (Tex. App—Houston [14th Dist.] 2012, pet. denied).

& n.4 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (evidence of lost gross revenues without deducting "normal business operating expenses" was not "competent evidence" of lost profits); *see also Holt*, 835 S.W2d at 83 n.1.  BSR did not attempt to offer such proof, and so there is not even a legitimate starting point for determining its purported damages.  BSR's failure of proof based on its strategic decisions at trial means that judgment should be rendered in favor of Carrizo on the contract claims.

## VI.    The Farmout Agreement Conclusively Negates BSR's Tort Claims

As was the case with the contract claim, BSR's fraud claim and tortious interference claims are barred by law because Carrizo had the absolute and unqualified contractual right to withhold its consent.  *See* part I.  Accordingly, the jury's findings of liability for fraud and tortious interference should be set aside, and the tort damages finding disregarded as immaterial.

### A.    BSR's Fraud Claim Is Premised Entirely on its Erroneous Construction of the Farmout Agreement

BSR's fraud claims were based on a purported statement by Carrizo's landman, Laufer, promising BSR that, notwithstanding the "hard consent" agreed to by the parties, Carrizo would grant its consent to BSR to assign the Farmout Agreement if BSR ever requested it.  This purported representation was contradicted by the express terms of the Farmout Agreement and so cannot support a fraud claim as a matter of law.  *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424-

51

25 (Tex. 2015) ("[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." (citation omitted); *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135, 141-42 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (A plaintiff "who voluntarily signed a contract whose terms he knew, should not be allowed to claim fraud based on an earlier oral statement inconsistent with a specific contract provision."). Moreover, "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc). The determination that Carrizo had the unqualified right to grant or withhold its consent under the Farmout Agreement means that BSR's claim for fraud fails as a matter of law.

## B. Carrizo's Justification Defense Was Established as a Matter of Law

For similar reasons, properly interpreting the Farmout Agreement to entitle Carrizo to an unqualified consent right also conclusively establishes Carrizo's business justification defense to BSR's tortious interference claim.

"Texas law recognizes a privilege to interfere with a contract if the defendant is exercising 'either (1) [its] own legal rights or (2) a good-faith claim to a colorable legal right.'" *See Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198,

218 (Tex. App.—San Antonio 2013, pet. filed) (quoting *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000)); *see also Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1995).

Carrizo had the absolute right to withhold its consent, as it bargained for in the Farmout Agreement. *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 77 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract."). Thus, Carrizo's justification defense was established as a matter of law.

## VII. Evidentiary Errors Require a New Trial

### A. Standard of Review

A trial court's exclusion of evidence is reviewed for abuse of discretion. *See Lively*, 51 S.W.3d at 641. A trial court abuses its discretion when its decision is unreasonable, arbitrary, or made without regard for any guiding rules or principles. *Id.* When the erroneous exclusion of evidence probably caused the rendition of an improper judgment, reversal is required. *JLG Trucking, LLC v. Garza*, 58 Tex. Sup. Ct. J. 726, 2015 WL 1870072, at *6 (Tex. Apr. 24, 2015); TEX. R. APP. P. 44.1(a)(1).

53

## B.     The Exclusion of Key Evidence Prejudiced Carrizo

There were several erroneous evidentiary rulings throughout the trial of this case that, when viewed either individually or cumulatively, require the granting of a new trial.

First, the trial court's erroneous exclusion of the Preliminary Closing Statement, which was the only evidence showing what BSR—as opposed the Exploration Partners—would have recovered under the PSA was error and undoubtedly resulted in an improper judgement. That document showed that BSR would have received only $1.358 million of the Raptor purchase price if the PSA had closed. 10RR120-24;DX32; *see also* part V.B. The balance of the purchase price was owed to the Exploration Partners. Considering that this document was the ***only*** proof of what BSR would have obtained in profits under the Raptor PSA, there can be no credible claim that it was not relevant. Yet with its exclusion, BSR was awarded almost $28 million in damages—an amount that clearly includes the purchase-price compensation for all Exploration Partners and is more than 20 times what BSR would have actually received had the PSA closed.

The trial court also excluded a written proposal by BSR to Raptor in which BSR admitted that Carrizo's refusal to consent would ***not*** preclude a valid assignment of the Farmout to Raptor and offered to indemnify Raptor from potential damages claims against it by Carrizo in order to conclude the sale. DX58. In that

letter, BSR stated that it was "of the opinion that the granting of Carrizo's consent to assignment of the Carrizo Farmout *is __not__ necessary to make the assignment of BSR's rights to [Raptor] legally effective*" and that "the only material legal consequence of failure to obtain such consent is that Carrizo might seek to recover damages . . . ." *Id.* at BSR002302 (emphasis added). BSR's position in that letter is a correct statement of Texas law. Carrizo could not void an assignment to Raptor without its consent, it could only sue for any damages resulting from its lack of consent to the assignment. *Gips v. Red Robin Corp.*, 366 S.W.2d 853, 857 (Tex. Civ. App.—Houston 1963, writ ref'd n.r.e.); *Palmer v. Liles*, 677 S.W.2d 661, 665 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). BSR's concession—which was entirely contrary to BSR's arguments at trial—should be dispositive of BSR's claims. At the very least, the jury should have been able to consider the inconsistency of BSR's positions in weighing the evidence.

These errors, as well as the other evidentiary errors discussed in parts III and IV, independently and cumulatively amounted to such a denial of Carrizo's right to due process and a fair and impartial jury trial as was reasonably calculated and probably did cause rendition of an improper judgment. Based upon these errors, individually and cumulatively, a new trial should be granted.

## VIII. Charge Errors Warrant a New Trial

### A. Standard of Review

This Court reviews the decision to submit or reject a particular jury instruction for abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (citing *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)). A trial court has discretion to determine proper jury instructions: "If an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Id.* (citation omitted). "'An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.'" *Id.* (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009)). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Id.* at 856 (internal quotations and citation omitted).

### B. The Contract Instructions Were Patently Erroneous

As to Question 1, Carrizo objected to the court's instruction that the Farmout Agreement was "silent about the reasons under which Carrizo could refuse consent," 13CR3180, because, as explained above at parts I-II, that is a matter of contract construction for the trial court, not for the jury. 10RR151 (reurging the grounds of Carrizo's motion for directed verdict as to the proposed charge questions and instructions). Carrizo also objected that instructing the jury that the Farmout

56

Agreement was "silent about the reasons under which Carrizo could refuse consent to BSR's assignment" 13CR3180, was in error because that determination is a question of law for the court and its inclusion would be confusing to a jury. 10RR148-49.

Similarly, the instruction relating to custom and usage was improper both because there was no basis for submitting it, 10RR148-49,151; *see also* parts I-II & IV, and because it was improperly worded. Carrizo specifically objected to the use of "custom and expectations"—a term that appears to have no support in the case law. 10RR191. BSR's counsel responded that "expectations" were sufficiently close to BSR's expert's testimony as to the relevant standard. *Id.* The trial court responded that, "I think your jury will probably not make much distinction between 'usage' and 'expectation.' I'll just leave it as 'expectation,' since that's the way it's listed." *Id.*

Although "custom and usage" evidence can be used to assist in interpreting technical terms in an ambiguous contract (which the Farmout Agreement was not), *see* part IV.C, "expectations" expands the definition past what the case law permits. Neither BSR nor the district court could offer any authority for such an expansion. And none exists. The submitted instructions were plainly improper and collectively amount to an abuse of discretion that more than likely resulted in an improper

57

verdict. Consequently, the judgment should be reversed for retrial of the contract issues with proper instructions.

## IX.    The Attorneys' Fees Award Should Be Reversed

As demonstrated in parts I-V above, the judgment awarding contract damages should be reversed. And as a result, the award of attorneys' fees on which it depends should likewise be set aside. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (permitting recovery of attorneys' fees for a successful contract claim).[29]

Independently, the fee award should be set aside because of the highly questionable proceedings that led to its entry. As noted above, the trial court awarded $1.018 million in attorneys' fees based on an *in camera* review of unredacted fee bills from BSR's attorneys that Carrizo was never able to access.

The Texas Supreme Court has emphasized that a party seeking fees must provide the trial court with sufficient information to allow it to make a meaningful evaluation of whether the tasks performed by the party's attorneys were reasonable and necessary. *City of Laredo v. Montano*, 414 S.W.3d 731, 734-36 (Tex. 2013); *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012).

BSR presented invoices that were so heavily redacted or so generalized in narrative description as to provide only minimal specifics as to the legal services

---

[29] The same holds true for the award of prejudgment interest, which must also be predicated on a recovery.

performed. 13CR3193-3250;14CR3251-440. Other than for Mr. Hoblit and Mr. Carroll, there was no description of the experience, reputations, or abilities of the multiple individuals that allegedly performed the legal services. 14CR3446,3455-57. Nor did BSR segregate the fees in any way between its contract and tort claims, even though the tort claims could not support a fee award. 14CR3447-48; *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006).

The trial court recognized that it was not in a position to evaluate the work that had allegedly been done because it ordered the unredacted fee bills to be submitted *in camera*. 14CR3483. Carrizo specifically objected to this *in camera* submission because the unredacted invoices had never been produced to Carrizo—despite outstanding discovery requests—and so the *in camera* process was being improperly used for the trial court to make *ex parte* fact findings. 14CR3485-87;3493.

The unorthodox procedure the trial court employed to make fact findings supporting a fee award of over $1 million requires its reversal. *See, e.g., In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (privileged information submitted in camera cannot be considered by the court for purposes of deciding facts). The district court's reliance on *in camera* documents deprived Carrizo of its ability to meaningfully cross-examine the evidence. *See* TEX. R. EVID. 611(b), 705(a). Without access to the underlying facts and data, Carrizo's ability to

59

discredit or challenge the information's interpretation or characterization was severely prejudiced. *See, e.g., In re Commitment of Polk*, 187 S.W.3d 550, 555 (Tex. App.—Beaumont 2006, no pet.) ("The State was entitled to cross-examine Dr. Reid concerning records he cited as the basis of his opinion, and to attempt to use the records to discredit his testimony.").

Because the unredacted fee statements submitted *in camera* could not be considered by the Court as part of BSR's proof of attorneys' fees, *DuPont*, 136 S.W.3d at 223, and the redacted versions filed of record were virtually unintelligible, BSR failed to provide legally and factually sufficient evidence from which the trial court could make findings as to the propriety and amount of the fee award. *City of Laredo*, 414 S.W.3d at 735-36. The Court should vacate the award of attorneys' fees to BSR for this independent reason.[30]

## CONCLUSION AND PRAYER

For these reasons, Defendant-Appellant Carrizo Oil & Gas, Inc. requests the Court to reverse the judgment of the district court and: (i) render a take-nothing judgment in favor of Carrizo; (ii) solely in the alternative, remand for a new trial;

---

[30] Carrizo also objected to the judgment to the extent it failed to condition the award of appellate attorneys' fees for proceedings in the Texas Supreme Court on BSR prevailing on the merits in that forum. 15CR3574-75,3529. Any award of attorneys' fees for appellate work not conditioned on BSR prevailing would be improper, and BSR offered no legal authority for such an unconditional award. *See Cessna Aircraft Co. v. Aircraft Network, LLC*, 345 S.W.3d 139, 147-48 (Tex. App.—Dallas 2011, no pet.) ("[A]n unconditional award of appellate attorney's fees is improper."). This aspect too should be reversed.

(iii) set aside the awards for attorneys' fees and interest; (iv) require that the award of appellate fees be conditioned upon success on appeal; and (v) grant such other and further relief to which Carrizo is entitled.

Respectfully submitted,

*/s/ Marcy Hogan Greer*
Marcy Hogan Greer
State Bar No. 08417650
mgreer@adjtlaw.com
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

John M. Zukowski
State Bar No. 22293400
jmz@zbsplaw.com
Pascal Paul Piazza
State Bar No. 15966850
ppp@zbsplaw.com
ZUKOWSKI, BRESENHAN, SINEX &
PETRY, L.L.P.
1177 West Loop South, Suite 1100
Houston, Texas 77027
Telephone: (713) 965-9969
Facsimile:  (713) 963-9169

Charles H. Clark
State Bar No. 04274000
chc@charlesclarklaw.com
THE LAW OFFICES OF CHARLES H. CLARK
604 West Woldert Street
Tyler, Texas 75702
Telephone: (903) 593-2514
Facsimile:  (903) 595-1294

**ATTORNEYS FOR APPELLANT**

62

## CERTIFICATE OF SERVICE

On December 22, 2015, I electronically filed this Brief of Appellant with the

Clerk of the Court using the eFile.TXCourts.gov electronic filing system which will

send notification of such filing to the following (unless otherwise noted below).

Otis Carroll
ocarrroll@icklaw.com
Deborah Race
drace@icklaw.com
Collin M. Maloney
cmaloney@icklaw.com
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Telephone: (903) 561-1600
Facsimile: (903) 581-1071

R. Clay Hoblit
choblit@hfdlaw.com
HOBLIT FERGUSON DARLING L.L.P.
2000 Frost Bank Plaza
802 North Carancahua
Corpus Christi, Texas 78401
Telephone: (361) 888-9392
Facsimile: (361) 888-9187

**ATTORNEYS FOR APPELLEE
BARROW-SHAVER RESOURCES
COMPANY**

*/s/ Marcy Hogan Greer*
Marcy Hogan Greer

## CERTIFICATE OF COMPLIANCE

Based on a word count run in Microsoft Word 2013, this brief contains 14,431

words, excluding the portions of the brief exempt from the word count under Texas

Rule of Appellate Procedure 9.4(i)(1).

*/s/ Marcy Hogan Greer*
Marcy Hogan Greer

**APPENDIX**

| Tab | Item |
| --- | --- |
| 1. | Final Judgment (15CR3528-30) |
| 2. | Jury Charge (15CR3532-3542) |
| 3. | Farmout Agreement (PX36) |
| 4. | Testimony of Scott Shaver (on bill of review) (7RR223-24; 118-20) |
| 5. | Testimony of Harold Bertram (on bill of review) (5RR246-53) |
| 6. | Louis J. Davis, *Preferential Rights to Purchase and Consents to Assign*, ASSOC. OF CORPORATE COUNSEL, HOUS. CHAPTER (Oct. 2, 2013) |

Appendix 1

FILED
LOIS ROGERS
DISTRICT CLERK

2015 JAN -5 PM 1: 31

SMITH COUNTY, TEXAS
BY [signature]
DEPUTY

CAUSE NO. 12-2565-A

| | | |
|---|---|---|
| BARROW-SHAVER RESOURCES | § | IN THE DISTRICT COURT |
| COMPANY | § | |
| VS. | § | 7TH JUDICIAL DISTRICT |
| | § | |
| CARRIZO OIL & GAS, INC. | § | SMITH COUNTY, TEXAS |

**FINAL JUDGMENT**

On September 16, 2014, this case was called for trial. Plaintiff, Barrow-Shaver Resources Company, appeared in person and through its attorneys and announced ready for trial. Defendant, Carrizo Oil & Gas, Inc., appeared in person and through its attorneys and announced ready for trial. After a jury was impaneled and sworn, it heard the evidence and arguments of counsel. On September 26, 2014, the jury reached a verdict. In response to the jury charge, the jury made findings that the Court received, filed and entered of record. The questions submitted to the jury and the jury's findings are in the file and record of this cause and are incorporated by reference.

Based on the jury verdict, the Court hereby **RENDERS** judgment for the plaintiff, Barrow-Shaver Resources Co., against defendant, Carrizo Oil & Gas, Inc.

Therefore, the Court **ORDERS** that plaintiff Barrow-Shaver Resources Co. recover damages from defendant Carrizo Oil & Gas, Inc., in the sum of $27,690,466.86; pre-judgment interest at the rate of 5% simple interest, in the sum of $2,898,015.67 [1]; attorney's fees as awarded below; court costs; and post-judgment interest at the rate of 5% compounded

---

[1] $2,791,805.79 through December 7th and $3793.21 every day thereafter until the day before the judgment is signed.

annually which will be applied to the total sum of the damages, pre-judgment interest, costs and attorney's fees[2] through trial and as awarded below on appeal.

Plaintiff, Barrow-Shaver, requested attorneys fees based on Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code. During trial, the plaintiff and defendant agreed and stipulated to the Court that if the plaintiff received a favorable verdict entitling it to fees, the plaintiff would submit the matter to the Court for a determination by affidavit. On November 25th this Court entered an Order on Attorney's fees, which order is incorporated by reference.

Based on this Court's review of the affidavits submitted, including the accompanying argument and evidence on fees, the Court **ORDERS** defendant Carrizo to pay plaintiff Barrow-Shaver $1,018,051.53 as the reasonable and necessary attorney's fees through the trial.

The Court further **ORDERS** that should defendant Carrizo unsuccessfully appeal this judgment to an intermediate court of appeals, Carrizo shall pay plaintiff Barrow-Shaver $75,000.000, representing the anticipated reasonable and necessary fees and expenses that would be incurred by plaintiff in successfully defending the appeal.

The Court further **ORDERS** that should defendant Carrizo seek review of this judgment in the Texas Supreme Court, plaintiff Barrow-Shaver will recover an additional $25,000.00 as the anticipated reasonable and necessary fees and expenses that would be incurred by plaintiff Barrow-Shaver in preparing or responding to a Petition for Review.

---

[2] The amount of post-judgment interest will be applied to the amount awarded as the reasonable and necessary fees for trial, $1,018,051.53, as soon as the judgment is entered. It will also be applied to the appellate fees as they are accrued and awarded at the various stages of the appeal: i.e., on the $75,000 in intermediate court fees when the decision issues in the Court of Appeals, on the Supreme Court fees when the petition is denied (or if the petition is granted, when the opinion issues) in the Supreme Court.

And the Court further **ORDERS** that if the Petition for Review is granted, plaintiff Barrow-Shaver will recover an additional $40,000.00 representing the anticipated reasonable and necessary fees and expenses that would be incurred by plaintiff Barrow-Shaver for preparing or responding to a brief on the merits in the Texas Supreme Court, *provided TT prevails in all or part of said appeal.* (✱)

This judgment finally disposes of all parties and claims, and is the final, appealable judgment in this cause. All other relief not expressly granted herein is denied.

The Court orders execution to issue for this judgment.

SIGNED on ~~December~~ ~~2014.~~
January 5, 2015.

THE HONORABLE KERRY E. RUSSELL
JUDGE PRESIDING

(✱) The Court incorporates by reference all of its Findings of Fact + Conclusions of Law stated in the Court's "Order on Attorney's Fees" date 11/25/14, as requested by the Defendant.

# Exhibit A

CAUSE NO. 12-2565-A

| | | |
|---|---|---|
| BARROW-SHAVER RESOURCES COMPANY | § | IN THE 7TH JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| CARRIZO OIL & GAS, INC. | § | SMITH COUNTY, TEXAS |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Here are the instructions for answering the questions.

1) Do not let bias, prejudice, or sympathy play any part in your decision.

2) Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3) You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4) If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5) All the questions and answers are important. No one should say that any question or answer is not important.

6) Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

-1-

Page 3532

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7) Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8) Do not answer questions by drawing straws or by any method of chance.

9) Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10) Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11) Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

-2-

## DEFINITIONS

You are instructed to use the following definitions when the defined words appear in specific questions or instructions.

1)   "BSR" refers to Plaintiff, Barrow-Shaver Resources Company now known as Barrow Shaver Resources Company LLC.

2)   "Carrizo" refers to Defendant, Carrizo Oil & Gas, Inc.

3)   "Raptor" refers to Raptor Petroleum II LLC.

4)   "Farmout Agreement" refers to the March 28, 2011 Letter Agreement between Carrizo Oil & Gas, Inc. and Barrow-Shaver Resources Company.

5)   "PSA" refers to the May 4, 2012 Purchase and Sale Agreement Between Barrow-Shaver Resources Company, a Texas General Partnership and Certain Other Owners As Set Forth on the Signature Page Hereto, Collectively As Seller and Raptor Petroleum II LLC, a Delaware Limited Liability Company As Buyer.

6)   "Fair market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

You are instructed that the Court and only the Court may interpret the Farmout Agreement. Any evidence of prior drafts or versions of the Farmout Agreement may not be used by you as to what the Farmout Agreement means. These may be used only to impeach the believeability of a witness, if it does.

-3-

## QUESTION 1

Did Carrizo fail to comply with the Farmout Agreement ?

You are instructed that the Farmout Agreement is silent about the reasons under which Carrizo could refuse consent to BSR's assignment of the Farmout Agreement to Raptor. Therefore, you may consider evidence of industry custom and expectations in deciding whether Carrizo breached its agreement with BSR. BSR contends that there was a custom and usage in the oil and gas industry that a consent to assignment not be unreasonably withheld. Custom and usage refers to a practice that is so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it.

Answer:        "Yes" or "No"

Answer:        YES

If you answered "Yes" to Question 1, then answer Question 2. Otherwise, do not answer Question 2 and proceed to Question 3.

## QUESTION 2

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate BSR for its damages, if any, that resulted from Carrizo's failure to comply with the Farmout Agreement, if any?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

The difference, if any, between the purchase price in the Raptor PSA and the fair market value, if any, of the remaining interests held by BSR on July 5, 2012, that was a natural, probable, and foreseeable consequence of Carrizo's failure to comply with the Farmout Agreement.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

Answer:   $ 27,690,466.86

## QUESTION 3

Did Carrizo commit fraud against BSR?

Fraud occurs when:

1) a party makes a material misrepresentation, and
2) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
3) the misrepresentation is made with the intent that it should be acted upon by the other party, and
4) the other party relies on the misrepresentation and thereby suffers injury

Misrepresentation means:

1) a false statement of fact, or
2) a promise of future performance made with an intent the time the promise was made, not to perform as promised, or
3) a statement of opinion that the maker knows to be false, or
4) a statement of opinion based on a false statement, or
5) an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.


Answer:      "Yes" or "No"

Answer:      _Yes_____

## QUESTION 4

Did Carrizo intentionally interfere with the PSA?

Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result.

Answer:     "Yes" or "No."

Answer:     _Yes_

---

If you answered "Yes" to Question 4, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 5

Did Carrizo have a good-faith belief that it had the legal right to withhold its consent under the terms of the Farmout Agreement?

Carrizo's motive is not relevant if its decision to withhold consent was based on a good-faith claim to a colorable legal right.

Good faith means the actual, subjective belief of the party in question, not the reasonableness of its belief.

Answer:     "Yes" or "No."

Answer:     _No_

If you answered "Yes" to Question 3, then answer the following Question 6 below. -OR- if you have answered "Yes" to Question 4 and "No" to Question 5 above, then answer the following Question 6. Otherwise, do not answer the following Question 6.


## QUESTION 6

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate BSR for its damages, if any, proximately caused by such conduct?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

The difference, if any, between the purchase price in the Raptor PSA and the fair market value, if any, of the remaining interests held by BSR on July 5, 2012, that was a natural, probable, and foreseeable consequence of Carrizo's failure to comply with the Farmout Agreement.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

Answer: $ 1,700,000.00

## Presiding Juror:

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

    a. have the complete charge read aloud if it will be helpful to your deliberations;

    b. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c. give written questions or comments to the bailiff who will give them to the judge;

    d. write down the answers you agree on;

    e. get the signatures for the verdict certificate; and

    f. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## Instructions for Signing the Verdict Certificate:

1. Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2. If ten jurors agree on every answer, those ten jurors sign the verdict.

   If eleven jurors agree on every answer, those eleven jurors sign the verdict.

   If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4. There are some special instructions before Questions 2, 5 and 6, explaining how to answer those questions. Please follow the instructions.

Do you understand these instructions? If you do not, please tell me now.

SIGNED on the 24th day September, 2014.

HONORABLE KERRY L. RUSSELL
Presiding Judge, 7th Judicial District Court
Smith County, Texas

# VERDICT CERTIFICATE

FILED

SEP 24 2014

LOIS ROGERS
CLERK, 7th DISTRICT COURT, SMITH CO., TX
BY _____ DEPUTY

Check one:

✓ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_Cary G. Seale_
Signature of Presiding Juror

_Cary G. Seale_
Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| | Signature | Name Printed |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |



Appendix 2

CAUSE NO. 12-2565-A

BARROW-SHAVER RESOURCES §     IN THE 7TH JUDICIAL
COMPANY                    §
                           §
                           §
VS.                        §     DISTRICT COURT OF
                           §
CARRIZO OIL & GAS, INC.    §     SMITH COUNTY, TEXAS

## <u>CHARGE OF THE COURT</u>

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Here are the instructions for answering the questions.

1) Do not let bias, prejudice, or sympathy play any part in your decision.

2) Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3) You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4) If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5) All the questions and answers are important. No one should say that any question or answer is not important.

6) Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

-1-

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7) Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8) Do not answer questions by drawing straws or by any method of chance.

9) Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10) Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11) Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

-2-

## DEFINITIONS

You are instructed to use the following definitions when the defined words appear in specific questions or instructions.

1) "BSR" refers to Plaintiff, Barrow-Shaver Resources Company now known as Barrow Shaver Resources Company LLC.

2) "Carrizo" refers to Defendant, Carrizo Oil & Gas, Inc.

3) "Raptor" refers to Raptor Petroleum II LLC.

4) "Farmout Agreement" refers to the March 28, 2011 Letter Agreement between Carrizo Oil & Gas, Inc. and Barrow-Shaver Resources Company.

5) "PSA" refers to the May 4, 2012 Purchase and Sale Agreement Between Barrow-Shaver Resources Company, a Texas General Partnership and Certain Other Owners As Set Forth on the Signature Page Hereto, Collectively As Seller and Raptor Petroleum II LLC, a Delaware Limited Liability Company As Buyer.

6) "Fair market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

You are instructed that the Court and only the Court may interpret the Farmout Agreement. Any evidence of prior drafts or versions of the Farmout Agreement may not be used by you as to what the Farmout Agreement means. These may be used only to impeach the believeability of a witness, if it does.

-3-

## QUESTION 1

Did Carrizo fail to comply with the Farmout Agreement ?

You are instructed that the Farmout Agreement is silent about the reasons under which Carrizo could refuse consent to BSR's assignment of the Farmout Agreement to Raptor. Therefore, you may consider evidence of industry custom and expectations in deciding whether Carrizo breached its agreement with BSR. BSR contends that there was a custom and usage in the oil and gas industry that a consent to assignment not be unreasonably withheld. Custom and usage refers to a practice that is so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it.

Answer:     "Yes" or "No"

Answer:     Yes

If you answered "Yes" to Question 1, then answer Question 2. Otherwise, do not answer Question 2 and proceed to Question 3.


## QUESTION 2

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate BSR for its damages, if any, that resulted from Carrizo's failure to comply with the Farmout Agreement, if any?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

The difference, if any, between the purchase price in the Raptor PSA and the fair market value, if any, of the remaining interests held by BSR on July 5, 2012, that was a natural, probable, and foreseeable consequence of Carrizo's failure to comply with the Farmout Agreement.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

Answer: $ 27,690,466.86

## QUESTION 3

Did Carrizo commit fraud against BSR?

Fraud occurs when:

1) a party makes a material misrepresentation, and
2) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
3) the misrepresentation is made with the intent that it should be acted upon by the other party, and
4) the other party relies on the misrepresentation and thereby suffers injury

Misrepresentation means:

1) a false statement of fact, or
2) a promise of future performance made with an intent the time the promise was made, not to perform as promised, or
3) a statement of opinion that the maker knows to be false, or
4) a statement of opinion based on a false statement, or
5) an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.

Answer:   "Yes" or "No"

Answer:   _Yes_

## QUESTION 4

Did Carrizo intentionally interfere with the PSA?

Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result.

Answer:     "Yes" or "No."

Answer:     _Yes_

If you answered "Yes" to Question 4, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 5

Did Carrizo have a good-faith belief that it had the legal right to withhold its consent under the terms of the Farmout Agreement?

Carrizo's motive is not relevant if its decision to withhold consent was based on a good-faith claim to a colorable legal right.

Good faith means the actual, subjective belief of the party in question, not the reasonableness of its belief.

Answer:     "Yes" or "No."

Answer:     _No_

If you answered "Yes" to Question 3, then answer the following Question 6 below. -OR- if you have answered "Yes" to Question 4 and "No" to Question 5 above, then answer the following Question 6. Otherwise, do not answer the following Question 6.

## QUESTION 6

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate BSR for its damages, if any, proximately caused by such conduct?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

The difference, if any, between the purchase price in the Raptor PSA and the fair market value, if any, of the remaining interests held by BSR on July 5, 2012, that was a natural, probable, and foreseeable consequence of Carrizo's failure to comply with the Farmout Agreement.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

Answer: $ __1,700,000.00__

## Presiding Juror:

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

   a. have the complete charge read aloud if it will be helpful to your deliberations;

   b. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

   c. give written questions or comments to the bailiff who will give them to the judge;

   d. write down the answers you agree on;

   e. get the signatures for the verdict certificate; and

   f. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.


## Instructions for Signing the Verdict Certificate:

1. Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2. If ten jurors agree on every answer, those ten jurors sign the verdict.

   If eleven jurors agree on every answer, those eleven jurors sign the verdict.

   If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4. There are some special instructions before Questions 2, 5 and 6, explaining how to answer those questions. Please follow the instructions.

Do you understand these instructions? If you do not, please tell me now.

SIGNED on the 24th day September, 2014.

_____
HONORABLE KERRY L. RUSSELL
Presiding Judge, 7th Judicial District Court
Smith County, Texas

FILED

SEP 24 2014

CLERK, 7th... LOIS ROGERS
BY... DISTRICT COURT, SMITH CO., TX
DEPUTY

## VERDICT CERTIFICATE

Check one:

✓ Our verdict is unanimous. All twelve of us have agreed to each and every answer.
The presiding juror has signed the certificate for all twelve of us.

_____
Signature of Presiding Juror

_____
Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

|  | Signature | Name Printed |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |



Appendix 3



March 28, 2011

Mr. Scott O. Shaver
Barrow-Shaver Resources Company
100 East Ferguson Street, Suite 404
Tyler, Texas 75702

RE:  Letter Agreement
     James R. Parkey et al Oil and Gas Lease dated April 24, 2007
     Archer and Baylor Counties, Texas

Gentlemen:

When executed by both undersigned parties in the manner set forth below, this Letter Agreement shall serve to set out the terms and conditions which Barrow-Shaver Resources Company (hereinafter referred to "BSR") shall earn an assignment or assignments from Carrizo Oil & Gas, Inc. ("Carrizo") with respect to Carrizo's interest in the Parkey Lease, as more fully described in Exhibit "A", attached hereto and made a part hereof.

In the event BSR spuds a well ("Test Well") on lands covered by the Parkey Lease prior to 11:59 pm on April 23, 2011, and thereafter drills same with due diligence and in a good and workmanlike manner to a minimum vertical depth of below 2500 feet subsurface (hereinafter referred to as the "Objective Depth") and establishes production in paying quantities from depths below 2500 feet subsurface in such well (an "Earning Well"), BSR shall earn from Carrizo an assignment covering Carrizo's interest (100% WI and 75% NRI) in the Parkey Lease as to that acreage and depths (below 2500' subsurface) that may be allocated for such well under the provisions of the Parkey Lease ("Earned Interest"). Within 10 days after BSR provides written notice to Carrizo of an Earning Well, Carrizo shall execute and deliver to BSR a mutually acceptable partial assignment covering the Earned Interest. The mutually acceptable partial assignment shall provide for Carrizo to reserve an overriding royalty equal to the difference of 25% and lease burdens of record as of the date of this Letter Agreement. Further, BSR may have the continuing right, but not the obligation, to earn additional interests from Carrizo in the Parkey Lease by perpetuating the remaining undeveloped acreage subject to the Parkey Lease by timely drilling additional wells to the Objective Depth ("Additional Wells") as provided for in the Parkey Lease ("Continuous Development"). Within 10 days after BSR provides written notice to Carrizo of each such additional Earning Well, Carrizo shall execute and deliver to BSR a mutually acceptable partial assignment covering such Earned Interest.

BSR may designate a day prior to spudding the Test Well to come to Carrizo's offices during normal business hours to review data in Carrizo's possession that is related to the Parkey Lease, inclusive of seismic (limited to review one square mile of BSR's choice, in the shape of square, if practical), well logs, production, Parkey Lease files and title opinions, collectively referred to as ("data"). BSR, it's employees, agents, representatives and consultants shall hold and protect such data to the same degree of care it uses in protecting its own proprietary information of like kind and hold such data in strict confidence. BSR shall furnish to Carrizo the names and addresses of individuals who have been provided access to all or part of the data and BSR specifically agrees to be responsible for any breach of any of the terms and provisions of this agreement by such individuals. BSR shall not remove any data presented by Carrizo from the location of the presentation or remove or copy any data provided by Carrizo, except as Carrizo may specifically authorize in writing. BSR shall not make, or allow to be made, additional copies

1

Plaintiff Trial Exhibit  36
Cause No. 12-2565-A
Barrow-Shaver v. Carrizo



Bertram
EXHIBIT NO.  7
12/6/13 gmc
Sunbelt Reporting & Litigation Services

of the data or otherwise reproduce any of the data, except as Carrizo may specifically authorize in writing. All data and copies and excerpts thereof shall remain or become Carrizo's property. Further, the seismic data and any derivative works therefrom will be considered confidential and for BSR use only and will not be given, sold, traded or otherwise made available to third parties. Carrizo makes no representation or warranty, expressed or implied as to the accuracy or quality of the data and any reliance thereon is at the sole risk and expense of BSR.

In the event BSR fails to timely spud the Test Well, then BSR shall pay to Carrizo, as liquidated damages, a cash consideration of $50,000.00, due on or before May 10, 2011. Should it be determined that the Parkey Lease has expired prior to April 22, 2011, then in that case, BSR shall not be subject to the $50,000.00 liquidated damage fee set forth above. Should BSR timely drill the Test Well as an Earning Well and desires to move forward with Continuous Development by drilling an Addition Well on the Parkey Lease, Carrizo shall provide to BSR the option to request to review additional seismic data (limited to one square mile of BSR's choice, in the shape of a square, if practical) and if BSR reviews such additional seismic data at Carrizo's offices, BSR shall be required to pay to Carrizo, as liquidated damages, a cash consideration of $25,000.00 in the event BSR fails to timely drill such Additional Well to perpetuate the remaining undeveloped acreage under the Parkey Lease. Such liquidated damages shall be paid to Carrizo within 15 days after BSR fails to timely drill such Additional Well. Carrizo agrees to continue to offer to BSR the option to review such additional seismic (limited to one square mile) as to each additional well BSR desires to drill on the Parkey Lease, subject to the liquidated damage fee of $25,000 as set forth above. Further, in the event the Parkey Lease expires and BSR should acquire a lease or an interest in lands covered by the Parkey lease within one (1) year from the date of this Letter Agreement, BSR shall notify Carrizo of the interest acquired and such interest shall be burdened with and be subject to an overriding royalty interest or an equivalent interest in favor of Carrizo equal to the difference between 25% and the lease royalty. Any interest acquired by BSR prior to this Letter Agreement shall not be subject to the overriding royalty interest or equivalent interest referenced in the previous sentence.

Carrizo's representatives shall at all times be allowed free access to the derrick floor at their sole risk and expense and to any and all information, geological or otherwise, pertaining to the drilling of the Test Well or any other well drilled pursuant to this Letter Agreement. Prior to running any logging device, coring or taking any formation test or other similar type test, BRS shall first give Carrizo reasonable notice in sufficient time to allow its representatives to be present to witness such test. BSR agrees to furnish Carrizo, upon its request, copies of each final print on electric logs, mud logs, DST, production logs, or any other information obtained by BRS and shall email daily reports to Carrizo. Any notice required by BSR shall be furnished to Carrizo's Doug Reid at Doug.Reid@crzo.net or any other representative named by Carrizo.

BSR shall, at BSR's sole cost and expense, maintain the lands used by BSR pursuant to this Letter Agreement in a clean and orderly condition, remove all waste products, fill in all pits dug in connection with BSR's operations hereunder and restore the lands as nearly as practicable to their original Environmental condition. If any well drilled by BSR is a dry hole or is non-productive, BSR shall properly plug any such well(s) drilled pursuant to this Letter Agreement and in accordance with the Parkey Lease.

The rights provided to BSR under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo.

BSR and Carrizo agree to execute and deliver all such other and additional instruments, notices, releases, acquittances and other documents, and will do all such other acts and things, as may be

2

necessary to more fully assure to BSR and Carrizo, all of the respective rights and interests herein granted or intended to be granted by this Letter Agreement.

In the event BSR elects not to drill any additional wells as provided for above on the Parkey Lease, BSR shall provide written notice to Carrizo at least 30 days prior to the lands covered by the Parkey Lease would otherwise expire.

BSR shall at all times at it's own expense, will provide and maintain in force during the existence of this Letter Agreement commercial general liability insurance in amounts typically carried by reputable, prudent operators, but in any event not less than $2,000,000.00 per occurrence, $3,000,000 aggregate, naming Carrizo as an additional insured, for any liability for property damage or personal injury arising as a result of (i) BSR's conducting operations on or off Parkey Lease, (ii) the exercise of any right granted hereunder or (iii) any obligation imposed hereby or associated in any way with activities conducted by BSR on or impacting the lands covered by the Parkey Lease. This insurance is to be carried by one or more reputable insurance companies authorized to transact business in Texas. BSR will furnish Carrizo with certificates of all insurance required by this Letter Agreement.

BSR, ITS HEIRS, SUCCESSORS AND ASSIGNS, EXPRESSLY AGREES TO INDEMNIFY AND HOLD CARRIZO, ITS HEIRS, SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY AND ALL COSTS, EXPENSES, CLAIMS, DEMANDS AND CAUSES OF ACTION OF WHATSOEVER KIND OR CHARACTER, INCLUDING COURT COSTS AND ATTORNEY'S FEES, ACCRUING OR RESULTING FROM OPERATIONS ON THE LANDS COVERED BY PARKEY LEASE BY BSR, ITS HEIRS, SUCCESSORS AND ASSIGNS. THIS INDEMNIFICATION EXPRESSLY INCLUDES ANY "ENVIRONMENTAL CLAIM" ON THE LAND COVERED BY PARKEY LEASE IN ORDER TO FIND, EXPLORE, OR REMOVE ANY OIL, GAS OR OTHER MINERALS COVERED BY THIS LETTER AGREEMENT. BSR, ITS HEIRS, SUCCESSORS AND ASSIGNS, EXPRESSLY AGREES TO INDEMNIFY AND HOLD HARMLESS CARRIZO, ITS HEIRS, SUCCESSORS AND ASSIGNS, FROM AND AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, REQUESTS, OR ORDERS FOR REMOVAL, ABATEMENT, OR REMEDIAL ACTION OR ANY TYPE OF CORRECTIVE ACTION OF ANY NATURE (AND ATTORNEY'S FEES, EXPENSES AND PENALTIES RELATING THERETO), RESULTING FROM OR IN ANY MANNER ARISING OUT OF BSR'S DEVELOPMENT OF OR OPERATIONS ON THE LAND COVERED BY PARKEY LEASE AND THE MARKETING OF THE PRODUCTS THEREFROM, REGARDLESS OF WHETHER COMMITTED BY BSR OR ITS AUTHORIZED AGENTS, CONTRACTORS, LICENSEES OR INVITEES. AS USED HEREIN, THE TERM "ENVIRONMENTAL CLAIM" SHALL MEAN (A) ANY EVENT OR CONDITION WITH RESPECT TO AIR, LAND, SOIL, SURFACE, SUBSURFACE STRATA, SURFACE WATER, GROUND WATER, OR SEDIMENT THAT CAUSES THE EARNED INTEREST TO BECOME SUBJECT TO REPORTING OR REMEDIATION UNDER, OR NOT BE IN COMPLIANCE WITH, ANY FEDERAL OR STATE ENVIRONMENTAL LAW, RULE OR REGULATION OR ANY PERMIT ISSUED PURSUANT TO ANY ENVIRONMENTAL LAW; OR (B) ANY EVENT OR CONDITION DESCRIBED IN THE PRECEDING CLAUSE (A), THAT RESULTS, OR COULD REASONABLY BE EXPECTED TO RESULT, IN LIABILITY TO ANY THIRD PERSON FOR INJURY TO OR DEATH OF ANY PERSON, PERSONS, OR DAMAGE, LOSS, OR DESTRUCTION OF PROPERTY LOCATED ON THE EARNED LEASES. THE TERM "ENVIRONMENTAL CLAIM" INCLUDES, WITHOUT LIMITATION, ANY SPILLING, LEAKING, POURING, EMISSION, EMPTYING, DISCHARGE, INJECTION, ESCAPE, TRANSMISSION, LEACHING, OR DUMPING (COLLECTIVELY, A "RELEASE"), OR ANY THREATENED RELEASE, OF ANY CONTAMINANTS SUBJECT TO REGULATION UNDER ENVIRONMENTAL LAW FROM, OR RELATED IN ANY WAY TO THE USE, OWNERSHIP, OR OPERATION OF, THE EARNED

3

INTEREST THAT HAS NOT BEEN REMEDIED IN ACCORDANCE WITH ALL APPLICABLE ENVIRONMENTAL LAWS.

The terms and provisions of this Letter Agreement are and shall be binding upon, and shall inure to the benefit of, BSR and Carrizo, and their respective heirs, devisees, legal and personal representatives, successors and assigns.

Warranty of title is neither expressed nor implied, except by, through and under Carrizo.

If you agree with all the terms and conditions in this Letter Agreement, please indicated your acceptance in the space provided below and return one copy to the undersigned.

Sincerely,

**CARRIZO OIL & GAS, INC.**

Gregory E. Evans
Vice President

**THE UNDERSIGNED PARTY HEREBY AGREES AND ACCEPTS THE TERMS AND CONDITIONS OF THIS LETTER AGREEMENT AS STATED ABOVE.**

**BARROW-SHAVER RESOURCES COMPANY**

By: _____

Title: _VP Land_

Date: _3-30-11_

4

TX 2018 001 018-000

ATTACHED TO AND MADE A PART OF THAT CERTAIN LETTER AGREEMENT DATED MARCH 28, 2011, BY AND BETWEEN CARRIZO OIL & GAS, INC. AND BARROW-SHAVER RESOURCES COMPANY.

All of the lands and rights covered by that certain Oil and Gas Lease dated April 24th 2007, by and between James R. Parkey, III, Natalie Sanchez, Ryan Mayo, Jolene P. Parkey and George Parkey, Trustee of the George P. Parkey Trust, Jolene P. Parkey, Robert W. Goff, Jr, Trustees of the James R. Parkey, Jr, Trust , as Lessor, and Cleo Oil, Inc, as Lessee, recorded in Volume 679, Page 272 of the Deed Records of Archer County, Texas, and Volume 319, Pages 228-263 in the Deed Records of Baylor County, Texas, as amended by that certain Amendment to Paid Up Oil and Gas Lease, recorded in Volume 692, Page 504 in the Deed Records of Archer County, Texas and Volume 319, Page 613 in the Deed Records of Baylor County, Texas, and as amended by that certain Second Amendment to Paid Up Oil and Gas Lease, recorded in Volume 696, Page 339 in the Deed Records of Archer County, Texas and Volume 321, Page 69 in the Deed Records of Baylor County, Texas and limited to those depths below 2500 feet subsurface; LESS AND EXCEPT: that certain acreage to be designated by Carrizo surrounding it's Parkey Ranch B-1 and B-2 wells, ("Parkey Lease").

Carrizo's interest in the Parkey Lease is subject to the following:

1.  Purchase and Sale Agreement by and between Cleo Oil, Inc. and PanAmerican Operating, Inc. dated May 19th 2008,  concerning the lands described in the above mentioned Paid Up Oil and Gas Lease, dated April 24, 2007 and the Assignment, Conveyance and Bill Of Sale dated July 7, 2008 between Cleo Oil, Inc and PanAmerican Operating, Inc., recorded in Volume 695, Page 755 of the Deed Records of Archer County, Texas and Volume 320, Page 709 in the Deed Records of Baylor County, Texas,

2.  Assignment of Oil, Gas and Mineral Leasehold Interest between PanAmerican Operating, Inc. and Carrizo Oil and Gas, Inc. dated July 7th, 2008, recorded in Volume 695, Page 789 in the Deed Records of Archer County, Texas and Volume 320, Page 684 in the Deed Records of Baylor County, Texas.

5

**PLAINTIFF'S
37**

Appendix 4

REPORTER'S RECORD

VOLUME 7 OF 36 VOLUMES

TRIAL COURT CAUSE NO. 12-2565-A

BARROW-SHAVER RESOURCES       *  IN THE DISTRICT COURT
COMPANY, now known as Barrow- *
Shaver Resources Company, LLC *
individually & as assignee of *
the causes of action of the   *
other parties to the Raptor   *  7th JUDICIAL DISTRICT
Purchase & Sale Agreement     *
                              *
VS.                           *
                              *
CARRIZO OIL & GAS, INC.       *  SMITH COUNTY, TEXAS

*************************************************

TRIAL ON THE MERITS

*************************************************

On the 19th day of September, 2014, the following proceedings came on to be heard in the above-entitled and -numbered cause before the HONORABLE JUDGE KERRY L. RUSSELL, Judge presiding, held in Tyler, Smith County, Texas.

Proceedings reported by Computerized Stenotype Machine.

Carrizo that Stewart had made this promise?

A   No, sir.

Q   Never once?

A   No, sir.

Q   It was so important to you that you relied on it and wouldn't have done this deal but for that promise. But you never told anyone at Carrizo that Stewart Laufer had made that promise.

A   I relied on him and his word.

Q   Yes, sir.

But you never told anyone at Carrizo that he had, in fact, made that promise to you, did you?

A   I was dealing with him.

Q   Mr. Shaver, my question was: Did you ever tell anyone at Carrizo that Stewart Laufer had made that promise?

A   Only after the fact.

Q   Who?

A   Through the depositions and so forth that came out.

Q   Right. But before this lawsuit was filed, we won't find one piece of paper that ever said that Stewart Laufer made that promise, correct?

A   No, sir.

Q   And you never told anyone at Carrizo that

Stewart Laufer made that promise, correct?

A   I dealt with Stewart the whole time and --
other than he and Sarah.

Q   Again, Mr. Shaver, you never told anyone at
Carrizo that Stewart Laufer made that promise, correct?

A   I did not.

Q   You didn't tell Sarah Ruddock that
Stewart Laufer made that promise, did you?

A   I don't know if I did or not.

Q   Well, we've looked at all the e-mails that you
sent to Sarah Ruddock where you were telling her about
the deal.

I didn't see in any of those e-mails where you
ever told her, "Oh, by the way, Stewart Laufer said if I
need a consent, I'll get the consent."

Did you see that in all the e-mails we've been
looking at all afternoon?

A   I had more conversations on the phone than I
did e-mails with those people.  I tend to talk to people
more so than e-mail them.

Q   But, Mr. Shaver, my question was:  Did you see
that in any of the e-mails that you sent to
Sarah Ruddock?

A   No, sir.

Q    You were trying to tell her what the deal was;

REPORTER'S RECORD

VOLUME 10 OF 36 VOLUMES

TRIAL COURT CAUSE NO. 12-2565-A

| | | |
|---|---|---|
| BARROW-SHAVER RESOURCES | * | IN THE DISTRICT COURT |
| COMPANY, now known as Barrow- | * | |
| Shaver Resources Company, LLC | * | |
| individually & as assignee of | * | |
| the causes of action of the | * | |
| other parties to the Raptor | * | 7th JUDICIAL DISTRICT |
| Purchase & Sale Agreement | * | |
| | * | |
| VS. | * | |
| | * | |
| CARRIZO OIL & GAS, INC. | * | SMITH COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 24th day of September, 2014, the following proceedings came on to be heard in the above-entitled and -numbered cause before the HONORABLE JUDGE KERRY L. RUSSELL, Judge presiding, held in Tyler, Smith County, Texas.

Proceedings reported by Computerized Stenotype Machine.

check my notes, Your Honor?

THE COURT: You may, sir.

MR. ZUKOWSKI: That will conclude our Bill with Mr. Johnson, Your Honor.

THE COURT: Thank you.

Plaintiff care to ask any questions of Mr. Johnson in the Bill of Exception?

MR. HOBLIT: No, Your Honor.

MR. ZUKOWSKI: May Mr. Johnson be excused?

THE COURT: He's free to go.

Thank you, sir.

(Witness exits courtroom.)

MR. ZUKOWSKI: And the last would be Mr. Shaver.

THE COURT: All right. Mr. Shaver, if you'll come on back up, please.

You may proceed.

SCOTT SHAVER,

having been duly sworn, further testified as follows:

DIRECT EXAMINATION FOR PURPOSES OF BILL OF EXCEPTION

BY MR. ZUKOWSKI:

Q    I'll give you a chance to get ready, Mr. Shaver. Are you ready?

A    Yes.

Q    And, again, you're not my client, but I'll caution you of the same thing. Those exhibits in front of you, they're loose. Be careful. Next thing you'll know, they'll be all over the place.

And, again, picking up in regard to the negotiations. Mr. Shaver, on March 29th, 2012, did Hal Bertram make you aware of the fact that Carrizo had deleted the "not unreasonably withheld" language from the proposed farmout agreement?

A    Yes, sir.

Q    And that was something that was a significant change to you, was it not?

A    Yes, sir.

Q    You discussed it with Mr. Bertram?

A    Yes, sir.

Q    And you subsequently decided that you wanted to have a phone conversation with Mr. Laufer for purposes of discussing that change, correct?

A    Yes, sir.

Q    And it was during that phone conversation that you alleged that Mr. Laufer made assurances to Barrow-Shaver that if Barrow-Shaver ever needed a consent to assign, that Mr. Laufer would -- and I'm paraphrasing -- would get that consent for you; is that correct?

A Yes, sir.

He had spoken with Hal earlier in the day and had told him that. And I told Hal I wanted to hear it from him myself; and so he told me that as well.

Q But it is the change in the form of the farmout agreement removing the "not unreasonably withheld" language that prompted you and Mr. Bertram to have the conversation with Mr. Laufer that led to his assurances, correct?

A Yes, sir.

Q If you will go to Defendant's Exhibit 32. And, again, that will be in that loose group. Are you there?

A I think I'm at the right one.

MR. ZUKOWSKI: May I approach the witness to be sure?

THE COURT: You may.

Q (By Mr. Zukowski) It should be the preliminary closing statement.

A Yes, sir. That's it.

Q Okay. Exhibit 32 is Barrow-Shaver Caddo Project Preliminary Closing Statement on Sale to Raptor Petroleum as of March 2nd, 2012, correct?

A Yes, sir.

Q And this is a document that was prepared by

Appendix 5

REPORTER'S RECORD
VOLUME 5 OF 36 VOLUMES
TRIAL COURT CAUSE NO. 12-2565-A

BARROW-SHAVER RESOURCES &ast; IN THE DISTRICT COURT
COMPANY, now known as Barrow- &ast;
Shaver Resources Company, LLC &ast;
individually & as assignee of &ast;
the causes of action of the &ast;
other parties to the Raptor &ast; 7th JUDICIAL DISTRICT
Purchase & Sale Agreement &ast;
&ast;
VS. &ast;
&ast;
CARRIZO OIL & GAS, INC. &ast; SMITH COUNTY, TEXAS

*************************************************

TRIAL ON THE MERITS

*************************************************

On the 17th day of September, 2014, the following

proceedings came on to be heard in the above-entitled

and -numbered cause before the HONORABLE JUDGE KERRY L.

RUSSELL, Judge presiding, held in Tyler, Smith County,

Texas.

Proceedings reported by Computerized Stenotype

Machine.

Q   And the e-mail is from Stewart Laufer; March 23rd, 2011; addressed to yourself?

A   That's correct.

Q   And it attaches a form of letter agreement, does it not?

A   That's correct.

Q   And I know, ultimately, you negotiated some changes.  But this, ultimately, became the form that was utilized for purposes of the farmout agreement that was finally signed by and between Barrow-Shaver and Carrizo, correct?

A   Some form of it, yes.

Q   This agreement -- if you go to the second page -- contains a provision in regards to consent to assignment, correct?  And I call your attention -- it's about four paragraphs down.  Second page.

A   Second page?

Q   Third full paragraph.  Begins with "The rights provided."

A   Yes, I found it.  Thank you.  Yes.

Q   It states, "The rights provided to BSR" -- and that's Barrow-Shaver, correct?

A   Correct.

Q   "Under this letter agreement may not be assigned, subleased or otherwise transferred in whole or

in part, without the express written consent of Carrizo, which consent shall not be unreasonably withheld."

Correct?

A   Correct.

Q   And that's something that Mr. Laufer added to the agreement?

A   That's correct.

Q   Now, as you read that provision, there's a requirement for Barrow-Shaver to obtain Carrizo's consent if they want to make an assignment.  Is that your understanding?

A   Yes, sir.

Q   But it also has a condition for Carrizo that if Carrizo -- in regard to that consent -- can't unreasonably withhold the consent?

A   That's correct.

MR. ZUKOWSKI:  Let me go back for the offer of proof.  First of all, Your Honor, I'd offer Exhibit Number 17, which is the one we just previously mentioned.

THE COURT:  Be admitted for the bill.

MR. ZUKOWSKI:  And I'm offering Exhibit Number 18 for the bill.

THE COURT:  Be admitted as well.

THE COURT REPORTER:  Are these

Plaintiff's exhibits or Defendant's exhibits, please?

Just for the record.

MR. ZUKOWSKI: Defendant's. I'll try to add that.

Q (By Mr. Zukowski) Let's go to Exhibit Number 20. Is Exhibit Number 20 another e-mail with attached farmout agreement?

A Yes, it is.

Q And the date of the e-mail is March 23rd, 2011, 5:26 p.m.?

A No, I've got March 28th.

Q Excuse me. I'm sorry. I'm looking at the wrong one. Let me go back to it.

It's March 29th, 2011, at 9:02 a.m.? Exhibit Number 20?

A Yes, the e-mail is. Yes.

Q And this is an e-mail that Stewart Laufer sent to you; is that correct?

A That is correct.

Q And it attaches a form of letter agreement, does it not?

A Yes, it does.

Q And if you go to the second page, the second paragraph from the bottom, do we find the consent provision?

A   Yes.

Q   All right.  And had Mr. Laufer changed the consent provision from the prior exhibit?

A   Yes.

Q   And had he deleted the "not unreasonably withheld" language?

A   Yes.

Q   In your opinion, was that 180-degree reversal from what the prior provision had been?

A   It changed the intent of the paragraph, yes.

Q   And it was a major change, was it not?

A   I felt like it was.

Q   All right.  Now, in your experience, was it common to find a consent provision in a farmout agreement that states "consent will not be unreasonably withheld"?

A   You find them in this form, and then you also find them in the previous form that we talked about.

Q   So you find --

A   Both ways.

Q   Both ways.

Now, your immediate concern was that Carrizo could withhold consent unreasonably under the terms as proposed by Mr. Laufer.  Is that not correct?

A   No.  By taking out that language, it left some

ambiguity.

Q   And you were concerned that, in fact, Carrizo could withhold consent unreasonably; is that correct?

A   They could withhold consent.

Q   For any reason?

A   For any reason.

Q   Did you immediately call Mr. Laufer about this?

A   I did.  I was concerned about him taking out that.

Q   And did you have a long conversation with Mr. Laufer?

A   We had a pretty lengthy conversation about it.

Q   Do you recall telling me that you talked ad nauseam with him about it?

A   Well, we talked about this issue ad nauseam. So we talked several times, yes.

Q   But right after receiving this e-mail with the change in the consent to assign provision, you called Mr. Laufer and had a long telephone conversation with him?

A   I had a conversation with him about this and why was it taken out; and he explained to me why he took it out.  He said that his management and his legal team advised him to take that out.

And I asked him why, and he said, "It was just company policy. Don't worry. I will work with you, and we'll give you consent down the road."

Q   All right. Now, after you talked to Mr. Laufer, did you go talk to Mr. Shaver?

A   Yes, I did.

Q   And did you tell Mr. Shaver about the fact that there had been this change in the former farmout agreement?

A   Yes, I did.

Q   And was Mr. Shaver concerned about the fact that the consent to assign provision had been changed?

A   Yes, he was concerned.

Q   And did you get on the phone with Mr. Shaver and call Stewart Laufer?

A   Yes, we did.

Q   And did you have a conversation with Stewart Laufer, again, about this consent provision?

A   Yes, we did.

Q   And was it a lengthy conversation?

A   Yeah. You know -- define "lengthy". We talked about this particular issue. And Stewart reiterated the same answer that he gave me; that his management had taken it out -- asked him to take it out. His legal team asked him to take it out. And that he

would work with us and give us consent down the road.

Not a problem.

Q   But you understood that Carrizo was going to insist that the farmout agreement have the consent provision as it was presented in this Exhibit Number 20?

A   Yes.

Q   And that Mr. Laufer was not authorized to put the language "not unreasonably withheld" back in the agreement?

A   I assume his management told him not to put it back in the agreement.

MR. ZUKOWSKI:  Now, Your Honor, I would move, for purposes of the bill, Defendant's Exhibit Number 20.

THE COURT:  Be admitted for the bill.

Q   (By Mr. Zukowski) Like you to go to Defendant's Exhibit Number 22.  Are you there?

A   Yes, sir.

Q   Exhibit 22, is that an e-mail from you?

A   Yes, it is.

Q   It was sent at 1:33 p.m.?

A   That's correct.

Q   And you are sending it to Mr. Laufer in regard to the draft agreement that he had sent you previously that morning, correct?

A   That's correct.

Q   And in the e-mail you state, "We appreciate the letter agreement. I have a couple of minor changes, and I feel we are ready to proceed."

Did I read that correctly?

A   That's correct.

Q   And if we go to the next page, do we see the minor changes?

A   Yes.

Q   And you just proposed three changes to the form that Mr. Laufer had proposed?

A   That's correct.

Q   But you didn't say anything about the consent to assign provision having changed, did you?

A   No.

Q   And although it was a big deal, you had two phone conversations with Mr. Laufer, you didn't bring it up in the e-mail that he had said anything or given you any assurances in regard to the change in the consent to assign provision, did you?

A   We had talked about it previously. We also talked about it the day that we met with Mr. Laufer.

Q   I'm talking about between -- I'm talking about on this day, Mr. Bertram. You received an e-mail at 9:00 in the morning on this day that changed the consent

to assign provision --

A   Yes.

Q   -- and then you sent another e-mail back to him, correct?

A   Yes, making these changes.

Q   And you told me that you'd had a couple of conversations with him, during which he gave you assurances that you relied on, correct?

A   Yes, that's correct.

Q   And based on those assurances that you received from Mr. Laufer during those two phone conversations, you decided to go forward with the farmout agreement, correct?

A   That's correct.

Q   In the form, as proposed by Mr. Laufer?

A   That's correct.

Q   And the reason you had -- we talked about this previously.  Is it true that the reason that you didn't tell Mr. Laufer anything, or say anything to Mr. Laufer about this e-mail, is you had felt that you had thoroughly discussed it during your phone conversations?

A   Yes.  We had discussed that issue, and he told me that his legal team and his management would not change that provision.

Q   I want you to go to Defendant's Exhibit



Appendix 6

**Presented:**
Association of Corporate Counsel
Houston Chapter
October 2, 2013
Houston

# Preferential Rights to Purchase and Consents to Assign

## Louis J. Davis

Author contact information:
Louis J. Davis
Baker & McKenzie LLP
Houston, Texas

louis.davis@bakermckenzie.com
713-427-5031

# PREFERENTIAL RIGHTS TO PURCHASE AND CONSENTS TO ASSIGN
## By Louis J. Davis[1]
## Baker & McKenzie LLP

## I.    INTRODUCTION AND SCOPE

This paper is divided into two parts, the first addressing preferential rights to purchase, and the second concerning consents to assign.

The first part of this paper is intended to provide a comprehensive analysis of the wide array of issues affecting the operation of preferential rights, including a discussion concerning the types of transactions that trigger preferential rights, the notice requirements that must be provided by the grantor to the rightholder following a triggering event, the process by which the rightholder exercises the preferential right, the situations in which a preferential right provision terminates, the possibility that parties other than the initial grantor and holder of the preferential right may become subject to the preferential right, the remedies available to the rightholder when the grantor breaches the preferential right, and the defenses available to the grantor in case of litigation alleging a breach of the preferential right.

It is important to acknowledge, with sincere thanks, that this paper draws heavily upon several previous works. Robert K. Wise, Andrew J. Szygenda, and Thomas F. Lillard provide an excellent and thorough discussion of preferential rights.[2] Rick Strange and Thomas Fahring similarly produced an exhaustive article with a special emphasis on preferential rights in package transactions, when the burdened property is sold by the grantor as part of a package of various assets.[3] The first part of this paper uses a similar structure to that of Wise, Szygenda, and Lillard to group the legal issues that affect preferential rights and builds upon their work by emphasizing the effect of cases decided since their article was published in 2010.

The second part of this paper addresses consents to assign and issues related to enforceability and breach thereof. First, it provides a background for consent-to-assign analysis by examining landlord-tenant law. Then, it discusses four forms of consent-to-assign provisions and issues that arise when they are encountered. Finally, it highlights some special concerns when dealing with consent provisions in state leases. The previous papers of Terry Cross[4] and Corby Considine[5] each contain detailed summations of judicial interpretations of consent-to-assign provisions and discussion of important drafting considerations, and were very helpful in the preparation of the second part of this paper.

---

[1] This paper is the result of the collective and significant efforts of several contributing authors and editors, including Baker & McKenzie Houston Office Oil and Gas Associates Rahul Vashi and Jonathan Lancton, and Baker & McKenzie Houston Office Summer Associates Katherine Jordan, Ross Staine and Benjamin Fedorko. Grateful thanks are extended to each for making the time to get this paper prepared.
[2] Robert K. Wise, Andrew J. Szygenda & Thomas F. Lillard, *First-Refusal Rights Under Texas Law*, 62 BAYLOR L. REV. 433 (2010).
[3] Rick Strange & Thomas Fahring, *Rights of First Refusal and Package Oil and Gas Transactions*, 53 S. TEX. L. REV. 29 (2011).
[4] Terry I. Cross, *The Ties that Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties*, 5 TEX. WESLAYAN L. REV. 193 (1999).
[5] Corby Considine, *Restrictions on Assignability* (1996).

an outright prohibition of indeterminate duration from selling any portion of the land in question less than four acres."[180]

In Texas, preferential rights do not violate the rule against perpetuities, even if the preferential right is unlimited in duration.[181]

The grantor may also defend himself by invoking the statute of limitations. The limitations period for a lawsuit seeking specific performance to require the conveyance of real property is four years from the date the cause of action accrues.[182] Generally, accrual of a cause of action occurs "when a wrongful act causes a legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred."[183] However, the discovery rule applies to certain causes of action, and "when applicable, provides that limitations begin to run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury."[184] In *Gilbreath v. Steed*, the Tyler Court of Appeals suggested that the discovery rule should not be applied in the context of a breach of a preferential right provision.[185] The court held that, whether or not the discovery rule applied, the preferential rightholder's claim was barred by the statute of limitations.[186] Thus, the court did not have to decide whether the discovery rule applied.[187] However, in dicta, the court noted that "[the holder] has cited no authority, nor are we aware of any, that supports her proposition that sale of. . . property . . . in disregard of a third party's right of first refusal tolls the limitations period on the right of first refusal once it has become ripe. Instead, [the holder's] right of first refusal ripened into an option when [the grantor] elected to sell the property."[188]

The grantor may further defend himself by invoking waiver. The doctrine of waiver can be asserted when the holder of a preferential right "intentionally relinquishes [the preferential right] or engages in intentional conduct inconsistent with claiming that right."[189] Waiver can be established either through an express renunciation or "[s]ilence or inaction, for so long a period as to show an intention to yield the known right."[190]

## III.    CONSENTS TO ASSIGN

In any given oil and gas transaction, there is likely to be at least one lease, easement or contract containing a consent-to-assign provision. This section of the paper will address consent-to-assign provisions in several respects. First, it will briefly discuss consents to assign in the landlord-tenant context for historical background. Second, it will highlight four types of consent-to-assign provisions that may be encountered in oil and gas transactions and discuss

---

[180] *Id.*

[181] *Forderhause*, 641 S.W.2d at 526; Weber v. Tex. Co., 83 F.2d 807, 808 (5th Cir. 1936) (applying Texas law); *Jarvis*, 2013 Tex. App. LEXIS at *12–13.

[182] TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(1).

[183] *Gilbreath v. Steed*, No. 12-11-00251, 2013 Tex. App. LEXIS 5947, at *10 (Tex. App.—Tyler May 15, 2013, no pet.) (mem. op.).

[184] *Id.* at *10–11.

[185] *Id.* at *11–12.

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] *Tenneco*, 925 S.W.2d at 643.

[190] *Id.*

their effects. Lastly, this paper will lay out the requirements for consent-to-assign provisions in state leases.

## A.    CONSENTS TO ASSIGN IN LANDLORD-TENANT LAW

Although it is not clear that legal principles applicable to consent to assignment provisions contained in landlord-tenant contracts are controlling with respect to consent to assignment provisions in oil and gas leases, since consent to assignment provisions are commonly found in landlord-tenant contracts, the following review of such legal principles may be instructive, and helpful, in evaluating the issues presented in the instant facts.

Because a landlord's consent to assignment is statutorily required in Texas,[191] consent to assignment provisions that require that a landlord/lessor give consent not to be unreasonably withheld are treated as covenants which, if breached, could be grounds for actions for damages.[192] Texas courts do not have a settled legal definition for what constitutes a reasonable reason to withhold consent.[193] However, in determining whether a landlord/lessor is acting unreasonably in withholding a consent to an assignment, courts have examined various factors, including the intended use of the property, the financial status of the proposed assignee, and the evidence supporting the commercial reasonableness of the denial.[194] Furthermore, reasonableness should be determined from the landlord – tenant lease terms, and any demand to change the terms of such lease in exchange for consent is deemed unreasonable.[195] Courts in other states have also applied reasonably prudent person standards and reasonable business person standards to determine reasonableness.[196]

If a landlord/lessor unreasonably withholds consent under one of the above applicable standards, a tenant/lessee has a cause of action for breach of the covenant to reasonably consent.[197] Furthermore, at least one court in another state has held that a tenant/lessee no longer needs to obtain consent if a landlord/lessor previously withheld consent unreasonably.[198] In that case, the court held that a landlord/lessor who withholds consent without giving any consideration to the financial stability of the proposed assignee and ignores reasonable efforts by tenant/lessee to obtain consent waives its right to withhold consent.[199] Under this rule, a landlord/lessor's unwillingness to reasonably consider a tenant/lessee's good faith effort to obtain consent voids the consent requirement.

In the absence of a covenant not to unreasonably withhold consent, Texas courts have been unwilling to read in an implied covenant that the landlord/lessor act reasonably in withholding consent.[200] However, the justification for not implying a covenant not to

---

[191] TEX. PROP. CODE ANN. § 91.005 (Vernon 1984).

[192] *Reynolds v. McCullough*, 739 S.W.2d 424, 429 (Tex. App.—San Antonio 1987, writ den.)

[193] *Burlington Northern and Santa Fe Rwy. Co. v. South Plains Switching, Ltd. Co.*, 174 S.W.3d 348, 352 (Tex. App.—Fort Worth [2nd Dist] 2005).

[194] *Burlington*, 174 S.W.3d *at* 353.

[195] *B.M.B. Corp. v. McMahan's Valley Stores*, 869 F.2d 865, 869 (5th Cir. 1989).

[196] *Ernst Home Center, Inc. v. Sato*, 910 P.2d 486 (Wash. App. [Div. 1] 1996); *Tenet Healthsystem Surgical, L.L.C. v. Jefferson Parish Hospital Svc. Dist. No. 1*, 426 F.3d 728 (5th Cir. 2005).

[197] *B.M.B.*, 869 F.2d *at* 869.

[198] *Roundup Tavern, Inc. v. Pardini*, 68 Wash. 2d 512, 514-515 (1966).

[199] *Id.*

[200] *Reynolds*, 739 S.W.2d *at* 429, *discussing* TEX. PROP. CODE ANN. § 91.005 (Vernon 1984).

unreasonably withhold consent comes from deference to a state property statute that allows a landlord to withhold consent to an assignment.[201] As such, and as noted above, it is unclear whether a court would find an implied covenant of reasonableness for a consent provision existed in an oil and gas lease, which is considered a fee interest and would not be governed by the landlord-tenant statute. No cases addressing this issue could be found. In the absence of statutory limitations like the one found in Texas, courts in other states have applied a standard of good faith and fair dealing for landlord-tenant contracts to read in a requirement that any non-consent be reasonable, even if the consent provision did not explicitly require reasonableness.[202] In this regard, even consent requirements without reasonableness standards may be subject to some good faith constraints on a lessor's ability to withhold consent, although it is unclear whether such a constraint would be applied to an oil and gas lease in Texas.

## B.    CONSENTS TO ASSIGN BETWEEN OIL AND GAS LESSOR AND LESSEE

In Texas, an oil and gas lease is a lease in name only, as Texas oil and gas leases create determinable fee interests, which are distinguishable from leases in the landlord-tenant context. As a general rule, attempted restraints on alienation of a fee are void. Thus, while consents in oil and gas leases are generally treated similarly to landlord-tenant leases, any consent provision in an oil and gas lease is likely unenforceable if the penalty for breach is forfeiture, or if the provision completely restricts future conveyances. If a lease contains such a provision, a court will probably construe the consent provision against the party seeking termination.[203]

Depending upon the language, consent-to-assign provisions may be construed as either covenants or conditions subsequent. As such, the provisions must be carefully analyzed in order to ascertain the risks, effects, and duties that arise thereunder. Breach of a covenant typically results in a cause of action for damages, whereas breach of a condition subsequent typically results in the underlying lease or assignment being forfeited or voided, respectively. Courts tend to disfavor conditions subsequent because "a failure of the grantee to perform as promised is not a sufficient ground for forfeiture of the estate granted in the absence of additional circumstances."[204] If the consent-to-assign provision can be read as a covenant, a court will likely interpret it as such.

Though this paper focuses on Texas law, it should be noted that Louisiana courts are more likely to enforce a consent-to-assign provision with forfeiture. Louisiana case law upholds cancellation as a remedy for breach.[205] In one case, the Louisiana Supreme Court affirmed the cancellation of a lease where a commercial lessee breached the consent-to-assign provision by subletting property across from the recently-built Superdome to be used as a parking facility.[206] The Court cancelled the lease, allowing the lessor to execute a new lease on the property, which had increased in value substantially.[207]

---

[201] *Id.*

[202] *Weisner v. 791 Park Avenue Corp.*, 180 N.Y.S. 2d 734 (1958), rev'd on other grounds, 190 N.Y.S.2d 70 (1959).

[203] Considine, *supra* note 5, at 3.

[204] *Haskins v. First City Nat'l Bank of Lufkin*, 698 S.W.2d 754, 757 (Tex. App.—Beaumont 1985, no writ) (quoting *Anderson v. Anderson*, 620 S.W.2d 815 (Tex. Civ. App.—Tyler 1981, no writ)).

[205] *See* Aimee L. Williams, *Restrictions on Assignment: Consent to Assign, Preferential Rights to Purchase and Maintenance of Uniform Interest Provisions*, 49TH ANN. INST. ON MINERAL L. 224, 248 (2002).

[206] *Ill. Cent. Gulf R.R. Co. v. Int'l Harvester Co.*, 368 So.2d 1009, 1012 (La. 1979).

[207] *See id.*

Consent-to-assign provisions can be written in countless ways, but this section discusses the following four general categories, all of which have been discussed in published cases. A provision can be classified as a Category 1, or "soft consent," if it states that consent to assign is required, but that consent shall not be unreasonably withheld. By contrast, a Category 2 consent provision requires prior written consent, but contains no language requiring that the consent shall not be unreasonably withheld. The last two categories are rare, but are discussed herein to illustrate the importance of carefully evaluating consent language, and the legal consequences of using certain provisions. Category 3 consent provisions require consent, the lack of which voids the underlying assignment. A Category 4 consent provision is created by language stating that consent is required and that lack of consent results in a forfeiture of the lease.

## 1.  Category 1: Consent Shall Not Be Unreasonably Withheld

An example of a Category 1 consent provisions is as follows: "The rights of lessee shall not be assigned without the written consent of lessor, which consent shall not be unreasonably withheld."

Category 1 consent provisions are quite common, and are both valid and enforceable.[208] Whether withholding consent is reasonable is a question of fact.[209] Courts have found that withholding consent due to economic concerns is not unreasonable.[210] However, there is very little guidance on what other facts might be considered reasonable bases for withholding consent. If a rightholder does withhold consent, and the parties seeking to transfer rights under a lease seek legal action claiming that the consent was unreasonably withheld, it should be noted that since the putative assignee is not a party to the contract containing the consent provision, only the party seeking to assign the contract would have standing to sue the party withholding consent.[211]

Due to courts' reluctance to void contracts, the breach of a Category 1 is highly unlikely to result in the termination of the underlying lease or invalidation of the improper assignment. If a rightholder withholds consent but a lessee assigns the oil and gas lease despite the lack of consent, the rightholder is instead limited to a cause of action for breach of contract against the assignee. However, the breach of contract claim typically results in a "no harm, no foul" situation, generally due to the difficulty on the part of the rightholder of proving damages for the assignor's breach.[212] As such, damages seldom result from breach of this type of consent provision.[213]

It is possible that a lessor could insert a monetary damages clause for breaches of contract resulting from unpermitted assignment of a lease without consent, and a court may allow such monetary damages if they are reasonable and not punitive, and if the parties acknowledge in the agreement that such monetary damages are a fair estimate of damages that would otherwise be difficult to ascertain. However, no cases with a lease containing such a clause could be found.

---

[208] Cross, *supra* note 4 at 224.

[209] *See Ridgeline, Inc. v. Crow-Gottesman Shafer #1*, 734 S.W.2d 114, 116 (Tex. App.—Austin 1987, no writ).

[210] *Mitchell's, Inc. v. Nelms*, 454 S.W.2d 809 (Tex. Civ. App.—Dallas 1970, writ ref'd n.r.e.) (commercial real estate lessor did not unreasonably withhold consent to sublease where lessor would not have received adequate rent).

[211] *Oliver Res. PLC v. Int'l Fin. Corp.*, 62 F.3d 128, 132 (5th Cir. 1995) (applying Texas law).

[212] *Id.* at 223.

[213] *Palmer v. Liles*, 677 S.W.2d 661, 665 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); Cross, *supra* note 4 at 223.

In the absence of any stipulated damages, the lessor will likely be unable to prove actual damages, thus breach of a Category 1 consent provision will probably result in a take-nothing judgment.

## 2. Category 2: Prior Written Consent Required, No Reasonableness Language

An example of a Category 2 consent provision is as follows: "The rights of lessee shall not be assigned without the written consent of lessor."

A Category 2 consent (or "hard" consent) is one that requires the lessee to seek the lessor's consent prior to assigning the lease, but lacks a clause stating that consent shall not be unreasonably withheld. Such consent provisions are common and generally enforceable. When interpreting such consent provisions in the oil and gas context, courts have directly adopted the law under the landlord-tenant context. Category 2 consents are distinguishable from Category 1 consents because they ostensibly allow a holder to withhold consent for any reason, whether or not such action is reasonable. Courts take such provisions at face value, and have been unwilling to imply a covenant that the consent cannot be unreasonably withheld if such a covenant is not included in an agreement.[214] As a result, a rightholder under a Category 2 consent will have a stronger cause for breach of contract than under Category 1 against an assignor who assigns the lease without proper consent, since a Category 2 consent allows the rightholder to avoid the question of reasonableness regarding the withheld consent. However, like a breach of a Category 1 consent, breach of a Category 2 provision would likely result in a cause of action for damages and a take-nothing judgment, since actual damages resulting from the lessee's breach will be difficult for the lessor to prove. As with Category 1 consents, courts are generally reluctant to allow forfeiture of the lease, so a party breaching the consent provision does not risk termination of the lease or invalidation of the assignment.

## 3. Category 3: Lack of Consent Voids the Assignment

An example of a Category 3 consent provision is as follows: "The rights of lessee are not assignable without the prior written consent of lessor, and an attempted transfer without prior written consent of lessor shall be void *ab initio* and without any effect."

Category 3 consent provisions are not uncommon, but there are very few cases discussing the enforceability of such provisions. A Category 3 consent-to-assign provision appears to avoid the issues surrounding a forfeiture consent clause, while still restricting assignability.[215] Unfortunately for lessors, a Category 3 consent provision may not yield the desired results. In fact, such a restriction on the assignability of a fee interest is akin to the language rejected by the Eastland Court of Appeals in *Soper v. Medford*.[216] In that case, the court found language stating that the underlying property was "never to be sold or traded off" without consent to be void as "repugnant to the grant" of a fee interest.[217]

It is unclear whether a court might allow a consent provision similar to Category 3 but which limits the consent so it cannot be unreasonably withheld. It is possible that parties could

---

[214] *Reynolds*, 739 S.W.2d at 429, *discussing* TEX. PROP. CODE ANN.§ 91.005 (Vernon's 1984); Williams, *supra* note 205 at 248.

[215] Cross, *supra* note 4 at 226.

[216] *Soper v. Medford*, 258 S.W.2d 118, 120–21 (Tex. Civ. App.—Eastland 1953, no writ).

[217] *Id.* at 122.

draft a hybrid Category 1/Category 3 consent provision that could arguably be less of an absolute restraint on alienation than the provision in *Soper*, and thus may be seen as enforceable. However, there has been no case law regarding such a provision, and in light of the lack of authority regarding what constitutes reasonable withholding of consent, there may be little practical difference between such a provision and the provision in *Soper*. In this regard, the provision would likely still be considered unenforceable.

4.     Category 4: Lessee's Failure to Obtain Consent Results in Forfeiture of the Lease

An example of a Category 4 consent provision is as follows: "In the event Lessee, its successors or assigns, should attempt to assign any interests without the written consent of the Lessors, this lease shall ipso facto terminate as to the interest so assigned, as well as all of the remaining interest owned by the person making such assignment."

As stated above, generally, consent provisions in oil and gas leases that provide forfeiture as a penalty for breach will not be enforced.[218] Because oil and gas leases are considered fee simple determinable interests, and attempted restraints on the alienation of a fee are void as a general rule, consents to assignment of oil and gas leases are not enforceable if they establish forfeiture as a penalty for breach or completely restrict future conveyances.[219] Texas courts have been unwilling to enforce forfeiture or automatic termination clauses (in consent provisions or otherwise), with one court holding that a forfeiture clause did not provide an "enforceable penalty."[220] In *Outlaw v. Bowen*, the Amarillo Court of Appeals refused to enforce a forfeiture clause in a mineral deed.[221] The deed in *Outlaw* attempted to maintain the uniformity of the underlying royalty interest by restricting the transfer of less than the whole interest, stating that "no conveyance or assignment of [the underlying] royalty shall ever be made except in whole and that any attempt to convey or assignany portion less than the whole thereof, either by grantee, her heirs or assigns, shall operate to forfeit the entire royalty hereby conveyed to the grantor herein, and any such conveyance or a portion thereof shall be null and void."[222] The court stated that the forfeiture provision was void as a restraint on alienation.[223] In coming to its decision, the court utilized language indicating it did not consider forfeiture of fee simple title to be an enforceable penalty.[224]

Since an oil and gas lessee holds a fee simple determinable as opposed to a fee simple interest, it is unclear whether a court would void a Category 4 consent-to-assign provision in an oil and gas lease in its entirety in light of *Outlaw*. Theoretically, fee simple title exists until the end of time; an oil and gas lease exists until the lease ceases to produce in paying quantities. Forfeiture of a perpetual estate is a more heinous penalty than forfeiture of an estate that will eventually terminate. As such, a Category 4 consent in an oil and gas lease is unlikely to be considered void on its face as the court held in *Outlaw*. Instead, a court will likely consider the

---

[218] Cross, *supra* note 4 at 224.

[219] *See Knight v. Chicago Corp.*, 183 S.W.2d 666 (Tex. Civ. App.—San Antonio 1944), *aff'd*, 188 S.W.2d 564 (Tex. 1945); *see also* Cross, *supra* note 4 at 226.

[220] *Outlaw v. Bowen*, 285 S.W.2d 280, 283 (Tex. Civ. App.—Amarillo 1955, writ ref'd n.r.e.); *see also* 5 Tex. Wesleyan L. Rev. *at* 226, noting that a forfeiture restraint in a consent requirement would be unreasonable under Restatement (Second) of Property §4.2 (1981).

[221] *Outlaw*, 285 S.W.2d 280.

[222] *Id* at 283.

[223] *Id.*

[224] *Id.*

consent provision valid, but avoid enforcing any language requiring lease forfeiture or termination. Although there have been cases in other states that have resulted in lease termination for breach of consent provisions,[225] Texas courts interpret restrictive provisions as strictly as possible against a lessor who seeks termination of the lease.[226] As the Texas Supreme Court held in *Knight v. Chicago Corp.* when it affirmed a San Antonio Court of Civil Appeals decision rejecting a provision similar to the above Category 4 example in an oil and gas lease, "if there is any uncertainty in the language so as to make it ambiguous or of doubtful meaning" that lease termination is the only remedy, then the court will avoid declaring a termination.[227]

The consent provision in *Knight* was designed to prolong the productive life of the lease by preventing any dilution of the working interest without the lessor's written consent.[228] Per the lease terms, an assignment of an undivided interest or an override would "ipso facto" terminate the lease.[229] In dicta, the San Antonio Court of Civil Appeals rejected the ipso facto language as creating a condition subsequent.[230] The court supported its decision not to give effect to the termination clause by quoting "§ 74. Construction of Instruments" in *American Jurisprudence*, which states that "[A] provision restraining the grantee from 'offering' or 'attempting' to alien is ordinarily void for uncertainty and cannot be restrained. This attitude of the courts is in accord with the general rule that conditions subsequent in conveyances are not to be favored, since they tend to impair the fee or estate granted."[231] In this regard, consent provisions in Texas are generally enforceable only to the extent that they do not stipulate that breach voids the lease or that assignability is expressly barred. However, the unenforceability of the consent provision in *Knight* was not determinative in the outcome of either the court of appeals case or the Texas Supreme Court case affirming the court of appeals' decision, and the *Knight* courts indicated that it may enforce a consent provision with a forfeiture penalty if the penalty was clearly and expressly provided in the lease.[232] As such, while *Knight* has not been interpreted to mean that lease termination provisions are ineffective per se, strict interpretation against termination in the case of any ambiguity, as favored by the court, make lease termination highly unlikely.

## C. STATE LEASES

### 1. Texas Public Lands and the Relinquishment Act

The consent provisions contained in state leases ought to be strictly adhered to because of the severity of the penalty for breach.[233] In general, oil and gas leases on Texas public lands are assignable.[234] However, any assignment must be filed with the General Land Office (the

---

[225] 4-51 *Kuntz, Law of Oil and Gas* §51.2(b).

[226] *Knight v. Chi. Corp.*, 183 S.W.2d 666 (Tex. Civ. App.—San Antonio 1944), *aff'd*, 188 S.W.2d 564 (Tex. 1945).

[227] *Knight*, 188 S.W.2d at 566.

[228] *Knight*, 183 S.W.2d at 668.

[229] *Id.*

[230] *See id.* at 671.

[231] *Knight*, 183 S.W.2d at 671, *quoting* 41 Am.Jur. 114.

[232] *See Knight*, 188 S.W.2d at 566.

[233] Considine, *supra* note 5 at 5.

[234] TEX. NAT. RES. CODE ANN. § 52.172 (West 2012).

"GLO").[235] Failure to file the assignment with the GLO may result in a forfeiture of the lease, which may be reinstated upon a showing of "satisfactory evidence of future compliance."[236]

Under the Relinquishment Act, the surface owner acts as an agent of the State in leasing minerals on public lands.[237] Prior to assigning the lease to an owner of the soil, both the lessee and the owner of the soil must notify the GLO of their intent to assign the lease.[238] If the lease is assigned to an owner of the soil without the GLO's prior consent, the lease is void as of the time of assignment.[239]

To further complicate the matter, the statute gives an extensive definition of who qualifies as an owner of the soil. Thus, a Relinquishment Act lessee should beware of assignments to people in the following categories:

(1)    a nominee of the owner of the soil;

(2)    a corporation or subsidiary in which the owner of the soil is a principal stockholder or is an employee of such a corporation or subsidiary;

(3)    a partnership in which the owner of the soil is a partner or is an employee of such a partnership;

(4)    a principal stockholder or employee of the corporation which is the owner of the soil;

(5)    a partner or employee in a partnership which owns the soil;

(6)    a fiduciary for the owner of the soil, including but not limited to a guardian, trustee, executor, administrator, receiver, or conservator for the owner of the soil; or

(7)    a family member of the owner of the soil or related to the owner of the soil by marriage, blood, or adoption.[240]

If title passes to any of the listed persons without the GLO's approval, the lease is void. Additionally, the owner of the soil is required to pay a penalty to the state for the attempted assignment.[241] Payment of the penalty does not revive the lease.[242]

2.    Louisiana State Leases

By comparison, Louisiana's consent provisions in state leases are considerably more stringent than those found in Texas state leases. Louisiana law provides that transfers or assignments of state leases are invalid unless approved by the State Mineral and Energy Board

---

[235] *Id.* at § 52.176.
[236] *Id.* at § 52.176 (lessee loses its interest in the lease, but the owner of the soil does not lose its agency).
[237] *Id.* at § 52.188(a).
[238] *Id.* at § 52.188(b).
[239] *Id.* at § 52.188(c).
[240] *Id.* at § 52.188(e).
[241] *Id.* at § 52.188(d).
[242] *Id.* at § 52.188(d)(1).

(the "Board").[243] Failure to obtain the Board's approval within sixty days of the execution of the assignment subjects the assigning party to a penalty of $100 per day.[244] The statute states that the Board may waive the penalty, but one commentator advises against relying on such a waiver.[245] Until the Board approves the assignment, Louisiana courts refuse to recognize that the purported assignee has any rights in the property.[246] Thus, one must pay close attention when assigning state leases in Louisiana.

## IV. CONCLUSION

There are a number of different issues presented by preferential rights to purchase and consents to assign. Not surprisingly, the particular language of a preferential right or consent to assign will directly affect the enforceability of such provisions. By recognizing and identifying the different clauses that may be used in preferential right and consent provisions and noting the issues that may arise therefrom, parties to oil and gas leases and similar instruments can avoid unintended or unanticipated restrictions on the use and assignability of oil and gas properties. Familiarization with common language used in such provisions and courts' treatment thereof can therefore aid in the drafting of clear and enforceable restrictions to transfer and prevent unnecessary disputes between grantors and rightholders.

---

[243] LA. REV. STAT. ANN. § 30:128A (2012).

[244] *Id.* at § 30:128B.

[245] Williams, *supra* note 205 at 255.

[246] *Id.* (citing *Transworld Drilling Co. v. Tex. Gen. Petroleum Corp.*, 480 So.2d 323, 325 (La. App. 4 Cir. 1985)).